974 P.2d 40

**Ralph A. YOUNG, Plaintiff–Appellant,**

v.

**The PLANNING COMMISSION OF the COUNTY OF KAUA'I, Defendant–Appellee, and Doe Governmental Entities for Agencies 1–10, Defendants.**

**No. 21493**

Supreme Court of Hawai'i.

Feb. 18, 1999.

Max W.J. Graham, Jr. (of Belles Graham Proudfoot & Wilson), on the briefs, for plaintiff-appellant.

Jonathan Chun, Deputy Corporation Counsel, on the briefs, for defendant-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by MOON, C.J.

In April 1996, plaintiff-appellant Ralph A. Young filed the instant declaratory judgment action against defendant-appellee Planning Commission of the County of Kaua'i [hereinafter, Kaua'i Planning Commission or the Commission]. In his complaint, Young alleged that his commercial tour boat operation on the Hanalei River did not constitute a "development" under the Hawai'i Coastal Zone Management Act (CZMA), Hawai'i Revised Statutes (HRS) chapter 205A, and the Special Management Area (SMA) Rules and Regulations of the County of Kaua'i [hereinafter, SMA Rules], and that, therefore, he was entitled to conduct his business without an SMA use permit.

Both the CZMA and SMA Rules provide in pertinent part that no "development" shall be permitted in the SMA in the absence of an SMA use permit. The CZMA defines "development" in relevant part as *any* of the uses,

activities, or operations on land or in or under water within the SMA that include, *inter alia:* (1) placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste; (2) change in the density or intensity of use of land; and (3) change in the intensity of use of water, ecology related thereto, or of access thereto. *See* HRS § 205A–22 (1993).

On summary judgment, the circuit court concluded that Young's tour boat operation constituted a development because it included the three aforementioned uses, activities, or operations. As such, the circuit court entered an order granting the Commission's motion for summary judgment and denying Young's motion for partial summary judgment. Judgment was thereafter entered in favor of the Commission and against Young.

Young, who appeals from the circuit court's order and judgment, challenges the circuit court's determination that his tour boat operation constitutes a development within the meaning of the CZMA, thus requiring him to have an SMA use permit, and argues that the circuit court improperly considered hearsay evidence in reaching its decision. For the reasons stated below, we affirm the circuit court's order and judgment.

## I. BACKGROUND

### A. The Coastal Zone Management Act

In October 1972, the Congress passed the Coastal Zone Management Act [hereinafter, federal CZMA] for the purpose of establishing a national program for the management, beneficial use, protection, and development of land and water resources of the coastal areas of the United States. Coastal Zone Management Act of 1972, Pub.L. No. 92–583, 86 Stat. 1280 (1972).[1] Essentially a state management program funding act, the federal CZMA authorized the Secretary of Commerce to make grants to any coastal state or

1. The federal CZMA was subsequently codified at 16 U.S.C. §§ 1452–1464 (1974).

2. Section 304 of the federal CZMA defines "coastal zone" as
    the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in prox-

territory in order to assist it in the development of a coastal zone management program. *Id.* § 305(a). Such coastal zone management program was to include:

(1) an identification of the boundaries of the coastal zone[2] subject to the management program;

(2) a definition of what shall constitute permissible land and water uses within the coastal zone which have a direct and significant impact on the coastal waters;

(3) an inventory and designation of areas of particular concern within the coastal zone;

(4) an identification of the means by which the state proposes to exert control over the land and water uses referred to in paragraph (2) of this subsection, including a listing of relevant constitutional provisions, legislative enactments, regulations, and judicial decisions;

(5) broad guidelines on priority of uses in particular areas, including specifically those uses of lowest priority; [and]

(6) a description of the organizational structure proposed to implement the management program, including the responsibilities and interrelationships of local, areawide, state, regional, and interstate agencies in the management process.

*Id.* § 305(b). The federal grant could be up to two-thirds of the total costs of the development program. *Id.* § 305(c).

In response to the enactment of the federal CZMA, the legislature of the State of Hawai'i took steps toward adopting a coastal zone management program. In 1973, the legislature passed Act 164, codified at HRS chapter 205A, requiring the State Department of Planning and Economic Development (DPED) to "prepare a coastal zone management program which shall set forth

imity to the shorelines of the several coastal states, and includes transitional and intertidal areas, salt marshes, wetlands, and beaches.... The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters....

objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone[ ]...." 1973 Haw. Sess. L. Act 164, § 2 at 265.

In 1975, the legislature passed the Environmental Shoreline Protection Act (Act 176) [hereinafter, the Shoreline Protection Act or Act 176], expressly finding and declaring "that it is the state policy to preserve, protect, and where possible, to restore the natural resources of the coastal zone of Hawaii." 1975 Haw. Sess. L. Act 176, § 1 at 385. The Shoreline Protection Act, which became effective June 2, 1975, amended HRS chapter 205A by adding a new part that provided for "interim controls on developments within an area along the shoreline" until the DPED could develop and implement a general coastal management program. *See id.* Under the act, every county was required to establish a special management area of land "extending not less than one hundred yards inland from the 'shoreline.'" *Id.* at 386. The objectives of the SMA were "the maintenance, restoration, and enhancement of the overall quality of the coastal zone environment, including, but not limited to, its amenities and aesthetic values, and to provide adequate public access to publicly owned or used beaches, recreation areas and national reserves." *Id.*

The Shoreline Protection Act further provided that "[n]o development or structure shall be constructed in any county within the [SMA] ... without obtaining a permit...." *Id.* at 388. Under the act,

"[d]evelopment" means, on land, in or under water, any of the following, the total cost or fair market value of which exceeds $25,000 or which significantly affects the coastal zone, taking into account potential cumulative effects: *The placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;* grading, removing, dredging, mining, or extraction of any materials; *change in the density or intensity of use of land, including but not limited to, the division or subdivision of land; change in the intensity of use of water, ecology related thereto, or of access thereto;* construction, reconstruction, de-

molition, or alteration of the size of any structure[ ]....

*Id.* at 385 (emphases added).

Section 3 of the Shoreline Protection Act did, however, contain the following "grandfather" clause:

This part shall not apply to developments or structures for which a building permit, planned development permit, planned unit development permit or ordinance, or special permit for cluster development was issued prior to December 1, 1975, or to subdivisions of property into single family residential lots of one acre or less which have received final approval and on which subdivision improvements including but not limited to grading, utilities, roads, street lighting and all required on-site and off-site improvements have been completed prior to December 1, 1975. This part shall not apply to interior renovations.

1975 Haw. Sess. L. Act 176, § 3 at 389.

Inasmuch as the Shoreline Protection Act afforded individual counties the authority to issue permits to regulate and control development in the SMA in accordance with the goals and objectives of the SMA, *see id.* at 388, the Kaua'i Planning Commission, on November 26, 1975, initially adopted Rules and Regulations Relating to Environmental Shoreline Protection of the County of Kaua'i. The Commission also adopted a map showing the location and boundary of the SMA for the Hanalei area [hereinafter, SMA boundary map].

In 1977, the legislature passed the Hawai'i Coastal Zone Management Act (Act 188), or CZMA, once again amending HRS chapter 205A. *See* 1977 Haw. Sess. L. Act 188, §§ 1 to 13 at 396–403. In short, the CZMA implemented a comprehensive coastal zone management program and, at the same time, maintained the interim controls of the Shoreline Protection Act, including the prohibition of all development within the SMA without a permit.

On December 12, 1979, the Kaua'i Planning Commission adopted the SMA Rules, which, in accordance with the CZMA, provided in pertinent part that no development

would be allowed in the SMA in the absence of an SMA use permit. *See* SMA Rules and Regulations of the County of Kaua'i §§ 4.0, 5.0, 7.3A, and 8.0. As indicated previously, these SMA Rules, as well as the CZMA, are the subject of the instant appeal. In 1979 and in 1983, the Commission also amended its SMA boundary map to include the length of the Hanalei River, from the river mouth to the Hanalei Bridge, as part of the SMA.

## B. *Young's Tour Boat Operation*

Beginning in July 1974, Young operated a business known as "Hanalei Sport Fishing and Tours," a sole proprietorship, whose purpose was to provide commercial charter and tour boat services to members of the general public. Services were to include: the transportation of passengers back and forth across the Hanalei River; the operation of boat rides up the Hanalei River; and the operation of boat rides (for sightseeing, whale and dolphin watching, snorkeling, waterskiing, and fishing) originating from the shoreline along the Hanalei River and running out the river mouth, into Hanalei Bay, and into the ocean waters beyond Hanalei Bay, including, the Nāpali Coast [hereinafter, collectively, Young's tour boat operation].

At approximately the same time in 1974, Young entered into a contract with Club Meditterannee (Club Med) and agreed to provide a Hanalei River boat shuttle service [hereinafter, Young's shuttle service] seven days a week, from 9:00 a.m. to 6:00 p.m.; at the time, Club Med was located on the north side of the Hanalei River. The purpose of Young's shuttle service was to provide Club Med guests and visitors with transportation back and forth across the Hanalei River, to allow them to get to Hanalei (Black Pot) Beach Park, Hanalei Beach, and Hanalei Town without having to drive around Princeville, across the Hanalei Bridge, and into Hanalei Town. Young also agreed to provide, and in fact provided, additional boating services to Club Med guests and visitors, including tours up the Hanalei River, tours out into Hanalei Bay and the Nāpali Coast, and sport fishing within the Hanalei Bay and in the surrounding ocean areas [hereinafter, Young's tour services]. Young's shuttle service and tour services were open to Club Med guests and visitors as well as members of the general public.

To provide his shuttle and tour services, Young initially leased a 17–foot Boston Whaler powered by an 85 h.p. outboard gasoline motor. Young also purchased a 14–foot McKee Craft powered by a 65 h.p. outboard gasoline motor and a spare 5.5 h.p. outboard gasoline motor. The McKee Craft, which was used primarily for the shuttle service, had a six-passenger capacity, in addition to a crew of one.

In July 1974, Young's shuttle service averaged approximately fifteen round trips an hour, or one hundred round trips a day. In August 1974, Young's shuttle service transported as many as 376 passengers a day, or approximately 130 round trips a day. On high passenger days, Young's shuttle service resulted in as many as forty-three separate engine starts.

By December 1974, Young's shuttle service transported as many as 202 passengers per day. In addition to the McKee Craft, Young also used a 16–foot Skiff, powered by a 5.5 h.p. outboard gasoline engine. Both the McKee Craft and Skiff were anchored in the Hanalei River, moored in front of Young's residence, which abuts the Hanalei River.

In May 1975, Young leased a new boat, a 19–foot Formula "Ultra 7" powered by a 115 h.p. outboard gasoline motor, to provide tour services; the Ultra 7 held six-passengers plus a crew of one. By June 1975, Young was averaging twenty-nine sports fishing charters a week, five Hanalei Bay and Nāpali Coast tours a week, two whale and dolphin watching tours a week, and one snorkeling trip a week. Additionally, Young was averaging one hundred passengers a day as part of his shuttle service. Most of the boating activities outside of the Hanalei River were conducted using the Ultra 7. The McKee Craft, on the other hand, was used for tours of Hanalei Bay, sports fishing, and Young's shuttle service.

From 1976, Young's tour boat operation continued to grow. From October 1976 to December 1976, Young used the McKee Craft to shuttle passengers from Club Med

to the "Pikake," a 42–foot sailboat, which took passengers on tours of the North Shore and the Nāpali Coast. In 1977, Young began leasing the "Double Trouble," a 22–foot Well-craft with two 50 h.p. outboard gasoline motors, to replace the Ultra 7. In July 1977, Young also leased the "Summer Wind," a 27–foot sailing catamaran with a 15 h.p. outboard gasoline motor and a six-passenger and one-crew capacity. The Summer Wind was used for sailing and fishing charters in the Hanalei Bay and along the Nāpali Coast. Also, in December 1977, Young entered into an agreement with the owners of a boat called the "Rip Tide V," a 42–foot Post craft with twin 310 h.p. diesel inboard engines and a six-passenger capacity, to provide sports fishing charters.

Throughout 1978, Young continued to use: the McKee Craft to provide shuttle services for Club Med; the Double Trouble for sports fishing charters, Hanalei Bay and Nāpali Coast tours, whale and dolphin watching, and snorkeling activities; the Rip Tide V for sports fishing charters; and the Summer Wind for sports fishing charters. From April to September 1979, Young also rented the "By Golly," an 18–foot Tradewinds craft with two 50 h.p. outboard gasoline motors and six-passenger capacity, for sports fishing charters. Young also rented the "Vaihere," a 24–foot Mako Craft with two 150 h.p. outboard gasoline motors and a six-passenger capacity, for sports fishing charters.

Finally, in July 1988, Young built the "U.F.O.," a 27–foot Power Catamaran powered by two 100 h.p. outboard gasoline motors, with a capacity of thirteen passengers and two crew members. Young used the UFO in his tour boat operations for activities including, sports fishing charters, Hanalei Bay and Nāpali Coast tours, snorkeling activities, and whale watching. By 1988, the income from Young's tour boat operation had increased by more than five hundred percent, from less than $5,000 in 1975 to almost $28,000 per year by 1988.

## C. *Procedural History*

Although Young conducted his tour boat operation within the boundaries of the SMA, Young operated his business from 1975 to 1988 without an SMA use permit. Beginning in 1988, the County of Kauaʻi, through its Planning Department and the Commission, informed Young and other tour boat operators that any tour boat operation for hire taking place within the Hanalei River would be considered a "development" subject to the terms and conditions of the CZMA and SMA Rules and that such tour boat activities would be prohibited unless the operators obtained permits pursuant to the SMA Rules.

Young also became aware that the Commission would enforce, and had enforced, its announced prohibition against tour boat operations that were taking place without required permits by filing injunctive actions. In addition to the filing of injunctive actions, Young learned that the Commission would enforce, and had enforced, its prohibition against tour boat operations in the Hanalei River via administrative proceedings and the imposition of administrative fines.

As a result of the Commission's actions, Young temporarily suspended his tour boat operation at some time in 1988. Years later, on June 29, 1992, Young petitioned the Commission for a "declaratory order," maintaining that his tour boat operation was not subject to either the CZMA or the SMA Rules to the extent that it existed prior to 1975. Young also claimed that he had "maintained his [tour boat operation] at the same level as had existed prior to June 2, 1975." On January 28, 1993, the Commission dismissed Young's petition. Young appealed to the fifth circuit court, but the parties thereafter dismissed the appeal.

Young subsequently applied for an SMA use permit to conduct his commercial tour boat operation within the Hanalei SMA. On June 24, 1993, the Commission approved and issued the SMA use permit. On May 23, 1995, the Commission extended Young's permit until March 31, 2000.

Nevertheless, on April 17, 1996, Young initiated the instant suit, filing a complaint for declaratory relief in the fifth circuit court. Young argued that "[t]he amount, level and nature of the [tour boat operation] conducted by Plaintiff Young prior to the enactment of the CZMA and the SMA Rules do not consti-

tute a 'development' which would subject such [tour boat operation] to any of the regulatory provisions of the CZMA or the SMA Rules." As such, Young claimed that he was "entitled to conduct such [tour boat operation] at such levels, in such numbers, and of such a nature as to be proven at trial, without the necessity of obtaining any permits pursuant to the CZMA or the SMA Rules." Young also requested an order:

 A. Establishing the amount, level and nature of Plaintiff Young's [tour boat operation] which existed prior to the enactment of the CZMA and the SMA Rules;

 B. Declaring that such [tour boat operation], provid[ed] that it does not exceed the levels established by the Court, does not constitute a "development" under the CZMA or the SMA Rules;

 C. Declaring that Plaintiff Young is entitled to conduct such [tour boat operation], in the level, amount or nature established by this Court, without the necessity of obtaining any permit under the CZMA or SMA Rules, and without interference by the [Commission]; and

 D. Enjoining and restraining the [Commission] ... from interfering with Plaintiff Young's conduct of the [tour boat operation].

On July 10, 1997, Young moved for partial summary judgment with respect to: (1) whether his tour boat operation, as conducted prior to the enactment of the CZMA and the SMA Rules, constituted a "development" requiring an SMA use permit; and (2) whether Young could conduct his tour boat operation "at such levels, in such numbers, and of such a nature as to be proven at trial, without the necessity of obtaining any permits pursuant to the CZMA or SMA Rules." On August 21, 1997, the Commission filed a memorandum in opposition to Young's motion for partial summary judgment, moving concurrently for summary judgment.

Requesting that the circuit court dismiss Young's complaint, the Commission argued that Young's tour boat operation was not exempt from the CZMA. Specifically, the Commission asserted that Young's tour boat operation qualified as a "development" under HRS § 205A–22 because it: (1) placed solid

material and/or gaseous, liquid, solid, or thermal wastes in the SMA; (2) changed the intensity of use of land within the SMA; and (3) changed the intensity of use of water within the SMA. Additionally, the Commission argued that Young's tour boat operation was not grandfathered under Act 176, which allowed for certain existing uses and activities within the SMA to continue without the necessity of applying for a SMA use permit.

In order to show (2) and (3), the Commission relied in part on the Kaua'i Coastal Recreation Management Plan [hereinafter, Coastal Management Plan] and the 1987 Final Recommendations of the Ad Hoc Committee For A Management Plan, Hanalei Bay/North Shore, Kaua'i [hereinafter, Ad Hoc Committee Report]. The Coastal Management Plan was prepared by the County of Kaua'i in response to public concern over increased commercial activities on Kauai's North Shore. Intended to serve as a basis for decisions relating to the control and regulation of commercial activities in County parks, the Coastal Management Plan describes, in pertinent part, the impact of commercial tour boat operations on Black Pot Park in 1985 and 1986, including: increased traffic; increased parking; increased use of Black Pot Park facilities—including restrooms, cesspools, showers, water and electricity; increased numbers of persons using Black Pot Park; increased congestion in the Hanalei River and in the waters fronting Black Pot Park; increased noise; increased conflicts with fishing and swimming activities in the area; increased safety concerns; and an increased demand for water born governmental services, such as rescue.

The Ad Hoc Committee Report, on the other hand, was prepared by a committee appointed by the Director of Transportation in response to House Resolution No. 298. House Resolution No. 298 had been adopted by the state legislature during the 1985 regular session and expressly "[r]equest[ed] the Director of Transportation to investigate the problems relating to the use of shorewaters and beaches of the north shore of Kaua'i and to develop a management plan to ensure the orderly use thereof." 1985 House Journal, at 1979. Like the Coastal Management Report,

the Ad Hoc Committee report discusses, *inter alia,* the existence of problems in the Hanalei area resulting from increased commercial operation in the Hanalei River mouth and the lack of facilities to accommodate such use.

In his memorandum in opposition to the Commission's motion for summary judgment, Young asserted that both the Coastal Management Plan and the Ad Hoc Committee Report were inadmissible hearsay. Additionally, Young argued that "the issues relating to the extent to which [Young] may engage in activities that existed prior to the CZMA Effective Date are factual issues to be determined at trial." Young did not attempt to refute any of the information disclosed in either the Coastal Management Plan or the Ad Hoc Committee Report.

Young's motion for partial summary judgment and the Commission's motion for summary judgment came on for hearing before the circuit court on September 2, 1997. Because Young did not request that any transcripts be included in the record on appeal, the nature and substance of arguments made by the parties and/or considered by the circuit court at that hearing are not known. On January 6, 1998, the circuit court issued its findings of fact, conclusions of law, decision and order granting the Commission's motion for summary judgment and denying Young's motion for partial summary judgment. Based on the foregoing facts, the circuit court entered the following pertinent conclusions of law (COLs):

3. [Young's] tour boat activities constitute a development within the meaning of HRS Section 205A–22.

4. Specifically [Young's] tour boat activities constitute a development since it results in the placement of solid materials or any gaseous, liquid, solid, or thermal waste within the SMA.

5. [Young's] activities are uses, activities, or operations on land which constitute a development since it changed the density or intensity of use of land within the SMA.

6. [Young's] activities are uses, activities, or operations in water which constitute a development since it changed the intensity of use of water within the SMA.

7. HRS Chapter 205A–22 is intended to address both quantitative as well as qualitative changes to the use of land or waters within the SMA.

8. [Young's] tour boat operations are not exempt from the provisions of HRS Chapter 205A.

9. Section 3 of Act 176 [the Shoreline Protection Act] expressly set[s] forth which uses and activities the Legislature intended to exempt from the provisions of HRS Chapter 205A. . . .

10. [Young's] uses, activities or operations are subject to the provisions of HRS Chapter 205A since they are not included in the list of activities that the Legislature expressly exempted from the provisions of HRS Chapter 205A set forth in Section 3 of Act 176.

11. [Young] has no vested rights in the commercial use of the portions of the Hanalei River located within the SMA that are owned by the State of Hawaii.

12. Based on the above, it is clear that [Young] has no vested right to use public property for his own commercial gain. If [Young] has no vested right to use governmental lands or water, he has no right to continue such use as a legitimate nonconforming use.

13. In the alternative, even if [Young] possessed a vested right to continue to use the waters and lands of the Hanalei River, [Young], by his conduct, abandoned this right.

14. [Young's] heresay [sic] objections to the exhibits and affidavit attached to Defendant County's Memorandum In Opposition To Plaintiff's Motion For Partial Summary Judgment Filed July 10, 1997 And Memorandum In Support Of Defendant Planning Commission Of The County Of Kauai's Motion For Summary Judgment are denied.

. . . .

As such, the circuit court granted the Commission's motion for summary judgment and denied Young's motion for partial summary judgment. On March 25, 1998, the circuit court entered judgment against Young and in favor of the Commission, dis-

missing Young's complaint with prejudice. Young timely appealed.

## II. *STANDARD OF REVIEW*

We review a circuit court's summary judgment order *de novo* under the same standard applied by the circuit court. *Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (citation omitted). As we have often stated, "[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, (citation and internal quotation marks omitted), *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992); *see also* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c)(1997). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995) (citation omitted).

## III. *LEGAL PRINCIPLES GOVERNING SUMMARY JUDGMENT MOTIONS*

"A summary judgment motion challenges the very existence or legal sufficiency of the claim or defense to which it is addressed." *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 396, 772 P.2d 1187, 1190 (1989) (citation and internal quotes omitted). "In effect[,] the moving party takes the position that he [or she] is entitled to prevail because his [or her] opponent has no valid claim for relief or defense to the action[.]" *Id.* (citation and ellipsis omitted). Accordingly, the moving party has the initial burden of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *See id.* at 396, 772 P.2d at 1190; *Dunlea v. Dappen*, 83 Hawai'i 28, 37, 924 P.2d 196, 205 (1996) (citation omitted). The moving party "may discharge his [or her] burden by demonstrating that if the case went to trial there would be no competent evidence to support a judgment for his [or her] oppo-

nent." *First Hawaiian Bank*, 70 Haw. at 396, 772 P.2d at 1190 (citation omitted); *cf. Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (a party moving for summary judgment under Federal Rules of Civil Procedure Rule 56 need not support his or her motion with affidavits or similar materials that negate his or her opponent's claims, but need only point out that there is absence of evidence to support the opponent's claims). "For if no 'evidence could be mustered to sustain the nonmoving party's position, a trial would be useless." *First Hawaiian Bank*, 70 Haw. at 397, 772 P.2d at 1190 (citation, brackets, and ellipsis omitted).

When a motion for summary judgment is made and supported,

> an adverse party may not rest upon the mere allegations or denials of his [or her] pleading, but his [or her] response, by affidavits or as otherwise provided in [HRCP Rule 56], must set forth *specific facts showing that there is a genuine issue for trial.* If he [or she] does not so respond, summary judgment, if appropriate, shall be entered against him [or her].

HRCP Rule 56(e) (1998) (emphasis added). In other words, "[a] party opposing a motion for summary judgment cannot discharge his or her burden by alleging conclusions, nor is he [or she] entitled to a trial on the basis of a hope that he can produce some evidence at that time." *Henderson v. Professional Coatings Corp.*, 72 Haw. 387, 401, 819 P.2d 84, 92 (1991) (citation omitted). On motion for summary judgment, "[t]he evidence is viewed in the light most favorable to the non-moving party." *State v. Tradewinds Elec. Serv. & Contracting, Inc.*, 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995) (citation omitted).

## IV. *PRINCIPLES OF STATUTORY CONSTRUCTION*

"We interpret statutes de novo." *Keliipuleole v. Wilson*, 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (citing *Shimabuku v. Montgomery Elevator Co.*, 79 Hawai'i 352, 357, 903 P.2d 48, 51 (1995)). "[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be

obtained primarily from the language contained in the statute itself." *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 255, 948 P.2d 1055, 1096 (1997) (quoting *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995)).

> Although the intention of the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. Thus, the plain language rule of statutory construction[ ] does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute.

*Sato v. Tawata*, 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995) (citation, brackets, internal quotation marks, and ellipses omitted).

**3.** Pursuant to HRS § 205A–22, "development" does not include:
    (1) Construction of a single-family residence that is not part of a larger development;
    (2) Repair or maintenance of roads and highways within existing rights-of-way;
    (3) Routine maintenance dredging of existing streams, channels, and drainage ways;
    (4) Repair and maintenance of underground utility lines, including but not limited to water, sewer, power, and telephone and minor appurtenant structures such as pad mounted transformers and sewer pump stations;
    (5) Zoning variances, except for height, density, parking, and shoreline setback;
    (6) Repair, maintenance, or interior alterations to existing structures;
    (7) Demolition or removal of structures, except those structures located on any historic site as designated in national or state registers;
    (8) Use of any land for the purpose of cultivating, planting, growing, and harvesting plants, crops, trees, and other agricultural, horticultural, or forestry products or animal husbandry, or aquaculture or maricul-

## V. DISCUSSION

A. *Young's Tour Boat Operation Constitutes a "Development" That Is Not Exempt from Either the CZMA or the SMA Rules.*

The CZMA currently defines "development" as *any* of the uses, activities, or operations on land or in or under water within a special management area that are included below:

> *(1) Placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;*

> (2) Grading, removing, dredging, mining, or extraction of any materials;

> *(3) Change in the density or intensity of use of land, including but not limited to the division or subdivision of land;*

> *(4) Change in the intensity of use of water, ecology related thereto, or of access thereto;* and

> (5) Construction, reconstruction, demolition, or alteration of the size of any structure.

HRS § 205A–22 (emphases added).[3]

The circuit court determined that Young's tour boat operation qualified as a "develop-

ture of plants or animals, or other agricultural purposes;
    (9) Transfer of title to land;
    (10) Creation or termination of easements, covenants, or other rights in structures or land;
    (11) Subdivision of land into lots greater than twenty acres in size;
    (12) Subdivision of a parcel of land into four or fewer parcels when no associated construction activities are proposed; provided that any land which is so subdivided shall not thereafter qualify for this exception with respect to any subsequent subdivision of any of the resulting parcels;
    (13) Installation of underground utility lines and appurtenant aboveground fixtures less than four feet in height along existing corridors;
    (14) Structural and nonstructural improvements to existing single-family residences, including additional dwelling units, where otherwise permissible; and
    (15) Nonstructural improvements to existing commercial structures;
provided that whenever the authority finds that any excluded use, activity, or operation is or

ment" based on (1), (3), and (4). However, inasmuch as "any" of the five uses, activities, or operations set forth above constitutes "development" under the statute, this court need only determine that Young's tour boat operation engaged in one of the foregoing uses, activities, or operations before determining that the circuit court, as a matter of law, correctly deemed Young's tour boat operation a "development."

**1. There is no genuine issue of material fact as to whether Young's tour boat operation changed the intensity of the use of water, or access thereto, within the SMA.**

■ Young concedes "that the initiation of tour-boat activities similar to his (after the CZMA Effective Date [or June 2, 1975,[4]]) could result in a change in the intensity of use of land or water. As such, new tour-boat activities could be construed as a development requiring a SMA Permit." Young argues, however, that,

> on the CZMA Effective Date, [Young's] Tour–Boat Operation was already in existence. So too were other "uses, activities, or operations" within the SMA. All of these "uses, activities, or operations" (which will be collectively referred to hereinafter as "Uses") which existed as of the CZMA Effective Date formed the base-line from which any changes in the density or intensity of use of land or water would be measured. Such existing Uses were not considered "development" subject to the CZMA, but merely the base-line from which change would be measured. As a result, [Young's] Tour–Boat Operation, as it existed as of the CZMA Effective Date, was not a development subject to the CZMA.

Young's argument is unpersuasive. Even assuming, *arguendo,* that all of the uses, activities, and operations that existed as of

June 2, 1975 "formed the base-line from which any changes in the density or intensity of use of land or water would be measured[,]" Young's tour boat operation still constitutes "development." As previously stated, HRS § 205A–22 defines "development" in pertinent part as *"[c]hange* in the intensity of use of water, ecology related thereto, or of access thereto[.]" Young's own affidavit avers that, in 1975, Young was using two small boats, a 14–foot McKee Craft (65 h.p.) and the 19–foot Ultra 7 (115 h.p.) to conduct his tour and shuttle services. By 1988, however, Young was regularly using a 27–foot power catamaran powered by two 100 h.p. gasoline motors and a 27–foot sailing catamaran with a 15 h.p. gasoline motor. Moreover, between 1976 and 1988, Young continuously brought in *additional* boats for his tour boat operation or replaced his older, smaller boats with larger craft. For example, in 1977, Young added a 22–foot boat powered by two 50 h.p. gasoline motors to replace the smaller 19–foot Ultra 7. In 1977, Young also began using a 42–foot Post craft powered by two 310 h.p. diesel engines. In 1979, Young *expanded* his business by renting an 18–foot Tradewinds craft powered by two 50 h.p. gasoline motors and a 24–foot Mako craft powered by two 150 h.p. gasoline motors. Based on Young's affidavit alone, it is clear that Young's tour boat operation changed in numerous respects subsequent to 1975, thereby effecting a change in the intensity of use of water in the Hanalei SMA.

Young himself acknowledges that he "changed details and aspects of his Tour–Boat Operation from that which existed as of the CZMA Effective Date[,]" but asserts "that such changes have not resulted in an intensification of his boating activities." Young states that "[t]he general rule is that nonconforming uses existing at the time of the effective date of a zoning ordinance or restriction may be continued." Moreover,

may become part of a larger project the cumulative impact of which may have a significant environmental or ecological effect on a special management area, that use, activity, or operation shall be defined as "development" for the purpose of this part.
It is undisputed that Young does not fall under any of the foregoing exceptions. Additionally, Young does not dispute that Act 176's grandfa-

ther clause, 1975 Haw. Sess. L. Act 176, § 3 at 389, does not apply to his tour boat operation.

4. We note that June 2, 1975 is more precisely the effective date of the Shoreline Protection Act, or Act 176, and not the effective date of the CZMA. Nevertheless, Young uniformly refers to June 2, 1975 as the "CZMA Effective Date."

Young argues that "[i]nsubstantial changes which are not detrimental to the philosophy of containment of nonconforming uses ... will not invalidate the nonconforming use.... In short, an owner can modernize facilities and employ improved instrumentalities in connection with a nonconforming building or use."

■ Young's argument is specious. Young presumes, without citation to any authority, that a commercial tour boat operation that uses public waters and is subject to environmental protection laws can be construed as a nonconforming use under the CZMA. Nevertheless, the concept of a nonconforming use derives from and has been used solely in the *zoning law* context to refer to "[a] use which lawfully existed prior to the enactment of a *zoning ordinance,* and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated[.]" Robert M. Anderson, 1 *American Law of Zoning* 3d § 6.01, at 446 (1986) (emphasis added). *See* Edward H. Ziegler, Jr., 4 *Rathkopf's The Law of Zoning and Planning* § 51.01[1] (4th ed.1998) [hereinafter, Rathkopf's]. Regardless, "the zoning law concept of 'non-conforming use' protects *landowners* who have *vested rights* to use their land in a fashion later prohibited by restrictive zoning regulations." *In re Haher's Sodus Point Bait Shop, Inc.,* 139 A.D.2d 950, 528 N.Y.S.2d 244, 246 (emphases added) (citation omitted), *appeal denied,* 73 N.Y.2d 701, 532 N.E.2d 101, 535 N.Y.S.2d 595 (1988). *See* Rathkopf's, § 51.01[2][a]. It is undisputed that Young operates his tour boat business within the SMA on the *public* waters of the Hanalei River and Hanalei Bay area and that Young has no proprietary interest in the land beneath the water nor any vested rights in the use of the Hanalei River or Hanalei Bay area for the purpose of conducting a commercial tour boat operation thereon. Insofar as Young's tour boat operation cannot reasonably be considered to be a nonconforming use, the law pertaining to nonconforming uses does not apply.

Strangely, notwithstanding that his opening brief cites to and relies substantially upon caselaw governing nonconforming uses, Young concedes in his reply brief that the "doctrine of nonconforming uses does not apply." Taking the position that his argument is based "on the specific definition of the term 'development' as it appears in H.R.S. Section 205A–22," and not "on common law principles applicable to nonconforming uses," Young contends that, "unless and until the Legislature amends the CZMA to change the definition of the term 'development' to exclude pre-existing activities such as Appellant Young's, Appellant Young must be permitted to take advantage of that definition to continue such pre-existing uses."

Young's inconsistent position is meritless. As stated previously, the CZMA provides that "[no] development or structure [should] be constructed in any county within the [SMA] ... without obtaining a permit...." 1975 Haw. Sess. L. Act 176, § 1 at 388. *See* SMA Rules §§ 4.0, 5.0, 7.3A, and 8.0. Furthermore, "development" is defined in pertinent part as "[c]hange in the intensity of use of water[.]" HRS § 205A–22. As previously discussed, Young, by his own admission, changed his tour boat operation in several respects subsequent to the effective date of the Shoreline Protection Act, in turn effecting a change in the intensity of use of water in the Hanalei SMA. Because Young failed to discharge his burden of establishing a genuine issue of material fact with respect to whether his tour boat operation changed the intensity of use of water in the Hanalei SMA, we hold that the circuit court correctly concluded as a matter of law that Young's tour boat operation constitutes a development that is not exempt from the CZMA or SMA rules.

2. **It is unnecessary for the court to decide whether Young also engaged in other activities constituting "development."**

As previously stated, in order to deem Young's tour boat operation a "development" under HRS chapter 205A, this court need only hold that his tour boat operation engaged in any one of the five uses, activities, or operations included under the definition of "development" in HRS § 205A–22. Because there is no genuine issue of material fact

with respect to whether Young's tour boat operation changed the intensity of use of water within the SMA, we do not reach the questions whether Young's tour boat operation also engaged, as the circuit court so ruled, in the uses, activities, or operations described in subsections (1) and (3) of HRS § 205A–22.

B. *Young's Hearsay Claims are Immaterial*

As previously stated, the Commission pointed to the Coastal Management Plan and the Ad Hoc Committee Report in order to show that the commercial tour boating industry in the Hanalei SMA, generally, and therefore Young's tour boat operation, specifically, had changed the intensity of use of water and land within the SMA. Young, who did not attempt to refute any of the facts presented in the reports, maintains that both reports constitute inadmissible hearsay and were improperly considered by the circuit court. However, because the discussion in section V.A.1, *supra*, illustrates that the record is sufficient, without reliance upon either report, to establish that Young's tour boat operation constitutes a development, it is unnecessary for us to address this contention.

## VI. *CONCLUSION*

Based on the foregoing, we affirm the circuit court's (1) January 6, 1998 findings of fact, conclusions of law, decision, and order granting the Commission's motion for summary judgment and denying Young's motion for partial summary judgment; and (2) March 25, 1998 judgment against Young and in favor of the Commission, dismissing Young's complaint with prejudice.