978 P.2d 822

Eric **CURTIS**, Elizabeth Curtis, George Schattauer, Margaret Schattauer, Brian Lievens, Andrea Lievens, and Captain Cook (Royal Hawaiian) Co., Ltd., Appellants–Appellees,

v.

**BOARD OF APPEALS, COUNTY OF HAWAI'I,** Planning Director, County of Hawai'i, Chief Engineer, County of Hawai'i Planning Department, County of Hawai'i, Appellees–Appellants,

v.

USCOC of Hawaii 3, Inc., Intervenor–Appellee–Appellant.

No. 20038.

Supreme Court of Hawai'i.

May 20, 1999.

Reconsideration Denied June 14, 1999.

As Amended June 15, 1999.

---

Gerald Takase, Deputy Corporation Counsel, for Appellants County of Hawaii planning director, chief engineer and planning department and Glenn H. Shiigi, Deputy Corporation Counsel, on the briefs, for appellants County of Hawaii board of appeals.

Diana L. Van De Car, on the briefs, Hilo, for intervenor-appellant USCOC of Hawaii 3, Inc.

Rodney M. Fujiyama and Ward F.N. Fujimoto of Fujiyama, Duffy & Fujiyama, on the briefs, Honolulu, for appellee Captain Cook (Royal Hawaiian) Co., Ltd.

Michael J. Matsukawa, on the briefs, for appellees Eric Curtis, Elizabeth Curtis, George Schattauer, Margaret Schattauer, Brian Lievens and Andrea Lievens.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by NAKAYAMA, J.

Appellees-appellants USCOC of Hawaii 3, Inc. (U.S. Cellular) and County of Hawai'i planning director, chief engineer, planning department, and board of appeals (board) (collectively, the County) appeal from the order and judgment of the third circuit court vacating the order of the board denying the challenge, brought by appellants-appellees Eric Curtis, Elizabeth Curtis, George Schattauer, Margaret Schattauer, Brian Lievens, Andrea Lievens, and Captain Cook (Royal Hawaiian) Co., Ltd. (collectively, the neighbors), of the planning director's approval of the construction of a 140–foot cellular phone

tower in the vicinity of the neighbors' property. On appeal, U.S. Cellular and the County argue that the circuit court erred in ruling that: (1) the tower was not a permitted use as of right in land classified as agricultural under the state land use law, Hawai'i Revised Statutes (HRS) chapter 205 (1993); and (2) the valuation of the tower development for the purposes of determining whether the development exceeds the $125,000 limit for a special management area (SMA) minor permit under the state coastal zone management act (CZMA), HRS chapter 205A, must include land acquisition costs. For the reasons stated below, we affirm the portion of the circuit court's order concluding that cellular phone towers are not permitted as of right in state agricultural districts and reverse the portion concluding that the valuation of the development under the CZMA must include land acquisition costs. However, because we hold that the board's finding that the valuation of the tower development did not exceed $125,000 was clearly erroneous, we reverse the County's issuance of an SMA minor permit to U.S. Cellular without prejudice to an application by U.S. Cellular for an SMA use permit.

## I. BACKGROUND

This appeal arises from the construction of a 140–foot cellular telephone tower by U.S. Cellular, a certified public utility, in Ka'awaloa, South Kona, Hawai'i. U.S. Cellular built the tower on a parcel leased to U.S. Cellular under a ten-year ground lease executed on May 14, 1992. The subject land lies in an SMA district under the CZMA, an agricultural district with a soil productivity rating of "C" under the state land use law, an agricultural county zoning district, and an "orchard" district under the county general plan.

The tower rests on a concrete foundation. A small prefabricated building containing communications equipment sits next to the tower. Photographs reveal that the tower stands well over twice the height of any of the surrounding vegetation and structures.

On July 13, 1992, U.S. Cellular submitted an SMA minor permit application to the Hawai'i County planning department. In its application, U.S. Cellular cited the "total cost/fair market value" of the tower as $63,-900. On October 20, 1992, the planning director granted U.S. Cellular an SMA minor permit. The record contains no evidence of any formal notice to the landowners neighboring the project site prior to the approval of the tower construction, or any report from the planning director to the planning commission regarding the SMA minor permit issuance.[1]

Construction of the tower began in early February 1993. In early March, the neighbors, landowners in the adjacent Ka'awaloa Orchards subdivision, appealed the planning director's grant of the SMA minor permit to the Hawai'i County Board of Appeals. The planning director, however, dismissed the appeals as untimely. In his letters to the neighbors, deputy planning director Norman Oleson stated:

> Please be advised that the thirty (30) day time limitation for filing an appeal from the decision of the Planning Director has lapsed. SMA Minor Permit No. 92–10 was granted by the Planning Director on October 20, 1992. Therefore, we hereby return to you the entire Notice of Appeal submittal, including the check in the amount of $200.

The neighbors subsequently appealed to the circuit court of the third circuit. Rejecting the argument of U.S. Cellular and the County that it lacked jurisdiction because the neighbors failed to previously appeal to the board of appeals, the court ruled that "absent sufficient legislative or administrative standards governing the time for filing [an appeal of the issuance of an SMA minor permit], the standard [is] . . . a reasonable time from the discovery of the subject action complained of." The court concluded that the neighbors filed their appeals within a reasonable time of their discovery of the tower construction and remanded the matter for a contested case before the board of appeals pursuant to

---

1. Hawai'i County Planning Commission Rules of Practice and Procedure (HCPCRPP) Rule 9–10(E)(2) (1992) mandates that: "The [d]irector shall file a monthly report of his actions in writing to the [planning commission]. Such report shall include the reasons for any action."

HRS chapter 91. The court entered final judgment on March 3, 1994, from which none of the parties appealed.

A hearings officer conducted hearings in September and October 1994. The neighbors raised a number of arguments, two of which are relevant to the present appeal. The neighbors first contended that the tower did not correspond with any of the uses permitted in state agricultural districts under the state land use law, *see* HRS § 205–4.5(a) (1993),[2] and U.S. Cellular, pursuant to HRS § 205–4.5(b) (Supp.1998),[3] was required to apply for a special permit under HRS § 205–

6 (Supp.1998).[4] U.S. Cellular and the County asserted that a special permit was unnecessary because the terms "public, private and quasi-public utility lines" and "communication equipment buildings" in HRS § 205–4.5(a)(7) covered the subject tower.

The neighbors also argued that, insofar as the project exceeded $125,000 in valuation and had a "substantial adverse environmental or ecological effect," the SMA minor permit issued by the planning department under the state CZMA was invalid, and U.S. Cellular had to apply for an SMA use permit.[5] The

2. HRS § 205–4.5(a) states in relevant part:

> Within the agricultural district all lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B shall be restricted to the following permitted uses:
> (1) Cultivation of crops, including but not limited to flowers, vegetables, foliage, fruits, forage, and timber;
> (2) Game and fish propagation;
> (3) Raising of livestock, including but not limited to poultry, bees, fish, or other animal or aquatic life that are propagated for economic or personal use;
> (4) Farm dwellings, employee housing, farm buildings, or activity or uses related to farming and animal husbandry;
> Farm dwelling as used in this paragraph means a single-family dwelling located on and used in connection with a farm, including clusters of single-family farm dwellings permitted within agricultural parks developed by the State, or where agricultural activity provides income to the family occupying the dwelling;
> (5) Public institutions and buildings which are necessary for agricultural practices;
> (6) Public and private open area types of recreational uses including day camps, picnic grounds, parks, and riding stables, but not including dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and overnight camps;
> (7) *Public, private, and quasi-public utility lines* and roadways, transformer stations, *communications equipment buildings,* solid waste transfer stations, major water storage tanks, and appurtenant small buildings such as booster pumping stations, but not including offices or yards for equipment, material, vehicle storage, repair or maintenance, or treatment plants, or corporation yards, or other like structures;
> (8) Retention, restoration, rehabilitation, or improvement of buildings or sites of historic or scenic interest;
> (9) Roadside stands for the sale of agricultural products grown on the premises;
> (10) Buildings and uses, including but not limited to mills, storage, and processing facilities, maintenance facilities, and vehicle and equipment storage areas that are normally considered directly accessory to the abovementioned uses and are permitted under section 205–2(d);
> (11) Agricultural parks; or
> (12) Wind energy facilities, including the appurtenances associated with the production and transmission of wind generated energy; provided that such facilities and appurtenances are compatible with agriculture uses and cause minimal adverse impact on agricultural land.

(Emphasis added.) Pursuant to section 15–15–25(b) of the state Land Use Commission rules (rev.1997), HRS § 205–4.5(a) also applies to agricultural lands with soil classifications of C, D, E, and U.

3. HRS § 205–4.5(b) states in relevant part: "Uses not expressly permitted in subsection (a) shall be prohibited, except the uses permitted as provided in section 205–6[.]"

4. HRS § 205–6 provides in relevant part: "The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified."

5. HRS § 205–22 (1993) defines "special management area minor permit" as:

> an action by the authority authorizing development *the valuation of which is not in excess of $125,000 and which has no substantial adverse environmental or ecological effect,* taking into account potential cumulative effects.

(Emphasis added.)

> "Special management area use permit," in contrast, means:
> an action by the authority authorizing development the valuation of which *exceeds $125,000 or which may have a substantial adverse environmental or ecological effect,* taking into account potential cumulative effects.

*Id.* (emphasis added).

neighbors pointed out that, in its building permit applications, U.S. Cellular reported the value of the tower structure as $170,700—$71,500 for the tower and $99,200 for the foundation.[6] The county tax records also assessed the value of the tower structure at $170,700. John Totten, a senior appraiser at the county tax office, testified that "it was our determination that this was the best method of valuing the communications tower, the permit value itself." Rick Warshauer, the county planner who initially reviewed U.S. Cellular's SMA minor permit application, agreed that such figures would represent "replacement cost" of the tower, "less inflation."

Tharon Anderson, project manager of the west region for U.S. Cellular, admitted that $170,700 represented the actual cost of the tower structure, but asserted that the figure did not accurately state the "replacement cost" relevant for the purposes of valuation under the CZMA. Anderson submitted estimates of the replacement cost of the tower ranging from $88,113.80 to $113,233.92. She explained that U.S. Cellular acquired the subject tower second-hand for $15,000 and that the "tower ... there right now is not a normal vendor that we would use;" the cost of two types of replacement towers was estimated at $14,500 and $19,940. Anderson also submitted estimates for two types of foundations, one using 21.6 cubic yards of cement and another using 62 cubic yards of cement. She testified that, "for whatever reason, I don't know," U.S. Cellular decided on a foundation design requiring 85 cubic yards of concrete. In the end, however, 130 cubic yards of concrete were actually poured, apparently because "voids," or lava tubes, were found during construction.[7] According to Anderson, at a low of $330 to a high of $450 per cubic yard of concrete, the foundation should have cost only $42,900 to $58,500, instead of the $99,200 actually paid. When asked for her opinion on the actual cost of the project, Anderson replied: "I have a personal opinion that I think they're ridiculous. [The contractor] is not on our bid list anymore. I don't, I don't know why he charges that much." Anderson stated that she was unaware of any complaint or legal action taken against the contractor. Regarding the $63,900 estimate on the SMA minor permit application, Anderson testified that it simply stated the "mainland average [for a tower project] ... doubled to give us a safety factor."

Deputy planning director Olesen testified that, upon receiving U.S. Cellular's SMA minor permit application, he reviewed the drawings and arrived at his own independent estimate of "somewhere between $85,000 and $90,000" for the entire project, including the cost of the tower, equipment building, and installation. Olesen stated that, in his 20 months of experience, the department had handled about 14 similar tower projects ranging in cost from $50,000 to $70,000. During direct examination by counsel for the County, the following exchange took place:

[COUNSEL]: Now, so as the Deputy Planning Director, are you familiar with Section 205A, which is the coastal zone management's special management area guidelines?

[OLESEN]: Yes, I am.

[COUNSEL]: Within that section, it's let me get the book up here, I believe it's section 205A–26. There is a definition for valuation to be used in determining the value for a SMA, an SMA permit, or the threshold values.... Could you read the definition for valuation.

[OLESEN]: Yes, "Valuation shall be determined by the authority...."

[COUNSEL]: And it is, is it the job of your office to look at the valuation or to make a determination as to what the valuation of the project is?

---

"Valuation" is defined as "the estimated cost to replace the structure in kind based on current replacement costs, or in the cases of other development as defined above, the fair market value of the development." *Id.*

6. The building permit application for the foundation was signed by the applicant on January 4, 1993, and the application for the tower was signed on February 3, 1993.

7. Anderson testified that the preliminary soil studies conducted by U.S. Cellular had indicated the possibility of lava tubes.

[OLESEN]: Not normally.

[COUNSEL]: Okay. Who would determine what the value is, if it was, if you were required to?

[OLESEN]: The applicant.

[COUNSEL]: Okay. Who's who is by, who is the authority as set forth in this definition?

[OLESEN]: Excuse, I'm not sure I understand the question.

[COUNSEL]: In subsection I, it says valuation shall be determined by the authority. Who is the authority in this case?

[OLESEN]: The Planning Director.

[COUNSEL]: Okay, and as the Deputy Planning Director are you also given that authority?

[OLESEN]: That is correct.

Olesen also testified that he reevaluated the project cost after learning of the actual cost of the project. Upon further review, however, his estimate only increased by $10,000. Olesen explained:

> The results of [further investigation] were, in evaluating the, now I had a better idea of exactly what the total yards of concrete were; and when I was able to evaluate that, I came up with a figure that was approximately $10,000 higher. Now my rationale on that was the differential between the theoretical foundation, which goes normally at around the numbers. If they take the high value of $400 dollars a yard, what we're dealing with here is that includes the excavation, it includes the forms, it includes the rebar, it includes the electrical grounding. In these particular cases, these types of towers, you have to have very, very good grounding. The additional yardage that had to go into this tower, however, would then go as effectively fill cost, which means that from my standpoint, I would look at it from the standpoint you just keep on bringing cement mixers in and just keep filling it, so that the extra cost was effectively at $85 a yard.

After the hearings officer issued her report and recommendation to the board, the parties filed written exceptions and, on December 22, 1994, presented oral argument to the board. On January 3, 1995, the board issued its findings of fact, conclusions of law, decision, and order. The order stated in relevant part:

## FINDINGS OF FACT

24. The Board concurs with the Planning Director's findings on the issuance of the SMA minor permit that the replacement cost of the cellular tower, or its "valuation" as defined by § 205A–22, HRS, is less than $125,000.

25. The Board concurs with the Planning Director's findings on the issuance of the SMA minor permit that the proposed development posed no substantial adverse environmental or ecological effects, taking into account potential cumulative effects.

26. The Board finds that although not required by law, U.S. Cellular could possibly have avoided some of the public controversy and animosity surrounding this case if it had been more receptive to the concerns of appellants.

27. The Board finds that there is a need for a legal process which will require public notice of public and private utility development on any land located adjacent to residential property.

## CONCLUSIONS OF LAW

1. The Board has jurisdiction over the subject matter of this appeal as well as the individual parties and entities involved herein.

2. The Appeal was properly brought pursuant to the Rules of Practice and Procedure of the Board.

12. The term "utility lines" as used in § 205-4.5(a)(7), HRS, is broad enough to cover communications transmission towers for cellular telephones.

13. A cellular tower located on state land use agricultural land is entirely consistent with the statutorily permitted uses under § 205-4.5, HRS.

14. A cellular tower located on state land use agricultural land does not require a special permit under § 205-6, HRS, as alleged by [the neighbors], because it is a

permitted use in the state land use agricultural district.

15. The subject parcel is located within the area governed by the State Coastal Zone Management Act. Any "development" within this area must comply with the requirements of Chapter 205A, HRS. "Development" is defined in § 205A–22, HRS as "the construction ... of any structure."

16. The replacement cost of the cellular tower, or its "valuation" as defined by § 205A–22, HRS, is less than $125,000.

17. [The neighbors] have failed to prove, by a preponderance of evidence, that the following effects of the tower have a substantial adverse environmental or ecological effect, taking into account potential cumulative effects:

 a. The tower's effect on [the neighbors'] view planes.

 b. The tower's effect on view planes from the state highway nearest to the coast.

 c. The effect of EMF from the tower on [the neighbors'] property values.

 d. The effect of EMF from the tower on [the neighbors'] health and safety.

 e. The effect of the noise caused by the tower's air conditioning equipment.

18. The Planning Director correctly applied the requirements for a "special management area minor permit" which authorizes development the valuation of which is not in excess of $125,000 and which has no substantial adverse environmental or ecological effect, taking into account potential cumulative effects. § 205A–22.

The neighbors appealed the board's decision to the circuit court. In addition to their arguments presented to the board, the neighbors contended that, insofar as the definition of "development" in HRS § 205A–22 includes "change in the density or intensity of use of land, including but not limited to the division or subdivision of land,"[8] and the lease of the plot for the tower operated as a "de facto" subdivision of land, the county should have included the cost of the lease in the "valuation" of the project. After a hearing, the circuit court reversed the board's decision, ruling that: 1) the tower was not a permitted use in an agricultural district; and 2) the "valuation" of the tower development must include the value of the land lease. The order stated in relevant part:

### CONCLUSIONS OF LAW

Based on the foregoing facts, the Court concludes as follows:

1. Statutes must be interpreted in a manner which gives purpose and meaning to all of the parts of the statutes.

2. The uses described in Section 205–4.5, HRS are direct permitted uses which are allowed in the state agricultural district. Sections 205–4.5(a)(7) & (12) allow:

 * * * Public, private and quasi-public utility lines and roadways, transformer stations, communications equipment buildings. * * * Wind energy facilities, including the appurtenances associated with the production and transmission of wind generated energy.

3. Uses which are not expressly permitted in Section 205–4.5(a), HRS are prohibited except as may be allowed by a special permit under Section 205–6, HRS. Section 205–4.5(b), HRS.

4. The term "utility lines" or "communications equipment buildings" do not include a cellular communication tower such as the one in question. The tower is not a direct permitted use under Section 205–4.5, HRS.

8. HRS § 205A–22 defines "development" as, *inter alia*:

 any of the uses, activities, or operations on land or in or under water within a special management area that are included below:
 (1) Placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste;
 (2) Grading, removing, dredging, mining, or extraction of any materials;

 (3) Change in the density or intensity of use of land, including but not limited to the division or subdivision of land;
 (4) Change in the intensity of use of water, ecology related thereto, or of access thereto; and
 (5) Construction, reconstruction, demolition, or alteration of the size of any structure....

5. This conclusion is further supported by the fact that the legislature expressly included "wind energy facilities" and "appurtenances" as direct permitted uses but made no provision for cellular communication towers.

6. The Director and Board erred in concluding that the tower is a direct permitted use in the state agricultural district and in not requiring U.S. Cellular to obtain a special permit for the tower under Section 205–6, HRS.

7. Under SMA law, all components of the tower are parts of the "development." This includes the 3,600 square foot Ground Lease as well as the foundation, the tower and the equipment buildings. Under *Hawaii's Thousand Friends v. City and County of Honolulu*, 75 Haw. 237, 858 P.2d 726 (1993), the valuation of a "development" must encompass the development as a whole and cannot be undertaken on a piecemeal basis by breaking down a development into its component parts.

8. While a public utility may be exempt from satisfying certain requirements of the county subdivision code, the physical act of subdividing the tower site through the Ground Lease is a "subdivision" and, hence, part of the tower "development," as the term is defined in Section 205A–22, HRS for SMA purposes. As a result, the valuation of the Ground Lease should have been included in the valuation of the tower "development" for purposes of the SMA law.

9. Neither the Director nor the Board included in the valuation the fair market value of the entire "development" for SMA purposes. The Board and the Director included only the estimated costs of the tower foundation and the structure itself, and excluded the Ground Lease's value and all other costs of the entire development. Nor did they determine whether the valuation of the Ground Lease would have made the total valuation of the tower "development" exceed $125,000.

10. Minor SMA Permit no. 92–10 and the building permits issued thereunder were invalidly issued and are of no effect.

11. Without a special permit, the tower is an unlawful activity in the state agricultural district.

The circuit court entered final judgment on June 7, 1996. U.S. Cellular subsequently filed a motion for reconsideration, arguing that the circuit court considered facts not in the agency record. On June 17, 1996, the circuit court issued an order granting in part and denying in part U.S. Cellular's motion for reconsideration. In the order, the court struck all the findings of fact in its January 5, 1996 order relating to the nature and cost of the ground lease, upheld its previous decision in all other respects, and remanded for further proceedings. U.S. Cellular timely appealed.

## II. STANDARD OF REVIEW

 Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences. *Konno v. County of Hawai'i*, 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997) (citations omitted).

HRS § 91–14(g) (1993) enumerates the standards of review applicable to an agency appeal and provides: Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*GATRI v. Blane,* 88 Hawai'i 108, 112, 962 P.2d 367, 371 (1998) (citing *Poe v. Hawai'i Labor Relations Board,* 87 Hawai'i 191, 194–95, 953 P.2d 569, 572–73 (1998)).

An agency's findings of fact are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5).

An agency's conclusions of law (COLs) are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law. *Hardin v. Akiba,* 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted); HRS §§ 91–14(g)(1), (2), and (4).

"A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." *Price v. Zoning Bd. of Appeals of City and County of Honolulu,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. *Dole Hawaii Division–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). "[T]he court should not substitute its own judgment for that of the agency." *Id.* (citing *Camara v. Agsalud,* 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

*Poe,* 87 Hawai'i at 197, 953 P.2d at 573.

## III. DISCUSSION

A. *The Circuit Court Had Jurisdiction To Hear Both The Initial And Subsequent Appeals.*

■ U.S. Cellular initially contests the circuit court's jurisdiction over the instant case.

U.S. Cellular asserts that the neighbors, upon receiving the letter from the planning department advising them that the time period for appealing the planning director's issuance of the SMA minor permit had lapsed, should have appealed to the board for a full contested case hearing on the timeliness issue. Absent a prior contested case hearing, U.S. Cellular contends, the circuit court did not have jurisdiction to rule on the timeliness of the neighbors' appeals and remand for a contested case hearing on the merits. Regarding the instant appeal, U.S. Cellular argues that, because the circuit court lacked jurisdiction in the first instance, "it could not thereafter acquire jurisdiction over this dispute merely because the contested case was held pursuant to its erroneous order. The Circuit Court's judgment should be vacated."

■ "It is well-settled that 'every court must ... determine as a threshold matter whether it has jurisdiction to decide the issue[s] presented.'" *Public Access Shoreline Hawai'i v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995) (quoting *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)) (brackets and ellipsis in original). The neighbors argue that, by previously failing to contest the circuit court's initial ruling that it had jurisdiction, U.S. Cellular is precluded from raising any jurisdictional objections in the present appeal. Nevertheless, "subject matter jurisdiction may not be waived and can be challenged at any time." *Id.* (citation omitted). *See also Bush v. Hawaiian Homes Comm'n,* 76 Hawai'i 128, 133, 870 P.2d 1272, 1277 (1994) ("[A jurisdictional] question is valid at any stage of the case, and though a lower court is found to have lacked jurisdiction, we have jurisdiction here on appeal, not of the merits, but for the purpose of correcting an error in jurisdiction."). Even though U.S. Cellular did not previously challenge the circuit court's ruling on jurisdiction, therefore, it may do so in the present appeal.

HRS § 91–14(a) (1993) provides the basis for the circuit court's appellate jurisdiction

over agency decisions, allowing "any person aggrieved by a final decision and order in a contested case" to seek judicial review pursuant to the Hawai'i Administrative Procedures Act (HAPA). In the instant case, the neighbors did not participate·in an actual contested case hearing prior to appealing to the circuit court.[9] The county rules, indeed, do not provide for a contested case hearing prior to the grant of an SMA minor permit.[10] Nevertheless, as we observed in *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw.· 81, 734 P.2d 161 (1987), the County does not leave those opposing the issuance of an SMA minor permit entirely without recourse. *See id.* at 91–92, 734 P.2d at 167–68. The Hawai'i County Board of Appeals Rules of Practice and Procedure (HCBARPP) (1997) mandates that "[a]ny person aggrieved by the decision of the [Planning] Director or Commission ... may appeal the decision to the Board," HCBARPP Rule 8–2, and that "[a]ny party to an appeal proceeding may obtain judicial review of the proceeding in the manner set forth in [HRS § 91–14]," HCBARPP Rule 8–17. Hawai'i County Charter § 5–6.3 (1991) further provides that "the board shall hear and determine all appeals from the actions of the planning director and planning commission" and that "[a]ll hearings shall be conducted according to [HAPA]." In this case, it is undisputed that the neighbors followed the applicable agency rules [11] and had standing as persons "aggrieved" [12] by the planning director's action, and thus were entitled to a contested case hearing before the board.

Although the neighbors appealed to the board, the planning director summarily rejected the appeals. Nothing in the county charter or rules allows the planning director to deny appeals to the .board of his or her own accord. Hawai'i County Charter § 5–6.3, however, provides that "the board shall be part of the planning department for administrative purposes and said department shall provide necessary clerical and other assistance." HCBARPP Rule 2–4(d) also states that: "If any document filed in a proceeding is not in substantial compliance with the applicable rules of the Board ..., the Board's designated representative shall return the document[.]" The county charter and rules, therefore, apparently grant the planning director the authority to issue denials of appeals to the board based on noncompliance with board rules.

HCBARPP Rule 2–4(d) does not expressly identify the planning director as the board's "designated representative" for denying appeals. Nevertheless, insofar as the board at no time questioned or disclaimed the planning director's action, and the planning director could not have issued the denial on his own authority,[13] we hold that the planning ·director acted on behalf of the board when he summarily rejected the neighbors' appeals as untimely. Accordingly, the planning director's denial constituted a "final decision" by the board under HRS § 91–14(a), which the circuit court had jurisdiction to review on appeal.

### B. *U.S. Cellular Must Obtain A Special Permit To Build A Cellular Telephone Tower In State Agricultural Land*

■ U.S. Cellular and the County argue that the tower in question is a permitted use

---

9. HRS § 91–1(5) (1993) defines a "contested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing."

10. HCPCRPP Rule 9–10(E) merely states that:

Where the Director finds the proposed use, activity or operation is not in excess of $125,000 in valuation; and will not have a significant adverse impact on the [SMA], he shall, after the review and recommendation of the Chief Engineer, issue a[SMA] Minor Permit.

11. The circuit court concluded that the neighbors' appeals were timely, and the appellants do not contest this determination.

12. Hawai'i County Code (HCC) § 25–2–20(c) (rev.1995) states:

A person is aggrieved by a decision of the director or the commission if:
(1) The person has an interest in the subject matter of the decision that is so directly and immediately affected, that the person's interest is clearly distinguishable from that of the general public; and
(2) The person is or will be adversely affected by the decision.

13. Indeed, the board found in its order on remand that the neighbors' appeal complied with the board's rules, and the County does not contest the circuit court's jurisdiction in the present appeal.

"as of right" in an agricultural district as a "utility line" or "communications equipment building" under section 205–4.5(a)(7). The neighbors, on the other hand, argue that the plain meanings of these terms do not encompass cellular telephone towers or antennas. Citing the principle "expressio unius est exclusio alterius," *see Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 233, 953 P.2d 1315, 1332 (1998) ("the mention of one thing implies the exclusion of another"), the neighbors argue that the absence of "cellular telephone towers" from the list of permitted uses in HRS § 205–4.5(a) evinces the legislature's intent to exclude such structures. Agreeing with the neighbors' analysis, the circuit court further reasoned that the express inclusion of "wind energy facilities, including the appurtenances associated with the production and transmission of wind generated energy," HRS § 205–4.5(a)(12), excluded "cellular telephone towers" by negative implication.

 In interpreting land use statutes and ordinances, Hawai'i appellate courts have followed standard rules of statutory construction. *See, e.g., Foster Village Community Ass'n v. Hess,* 4 Haw.App. 463, 469, 667 P.2d 850, 854 (1983).

> [Land use statutes] are in derogation of the common law, and their provisions must be strictly construed. [T]he terms of the [land use statute] should be accorded their natural and most obvious meaning when there is no manifest legislative intent contrarywise. In interpreting a [land use statute], the duty of this court is to ascertain and give effect to the intent of the [legislature]....

*Korean Buddhist Temple,* 87 Hawai'i at 232, 953 P.2d at 1330 (quoting *State v. Lum,* 8 Haw.App. 406, 410, 807 P.2d 40, 43, *cert. denied,* 72 Haw. 619, 841 P.2d 1075 (1991)) (brackets added).

In *Korean Buddhist Temple,* we considered, *inter alia,* a question of interpretation regarding the term "spire." In our view, "[s]pire [was] not an ambiguous or technical term." *Id.* at 233, 953 P.2d at 1331. Even assuming that "spire" was ambiguous, we held that, given the zoning ordinance's apparent purpose of regulating structure height, "spire" did not include a "roof" described as "saddle shaped with a pointed peak and ornamental cap at either end." We reasoned:

> Clearly, the "reason and spirit" behind creating these exemptions was to allow for minor intrusions on height regulations—rather than a wholesale abandonment of them simply because the primary structure in question happens to be "pointed." Such a construction would lead to an absurdity.

*Id.*

In the instant case, it is undisputed that U.S. Cellular is a "public utility." The neighbors, however, argue that the terms "utility lines" and "communications equipment buildings" are unambiguous and plainly exclude "cellular telephone towers." Preliminarily, we agree that the plain meaning of "communications equipment buildings" excludes cellular telephone towers. Black's Law Dictionary (6th ed.1990) defines "building" as a "[s]tructure designed for habitation, shelter, storage.... A structure or edifice enclosing a space within its walls[.]" *Id.* at 194–95. The term "communications equipment building," therefore, denotes a structure—not unlike the small prefabricated building accompanying the tower in the instant case—containing or housing communications equipment, rather than standing as a gigantic piece of such equipment in itself. At the outset, therefore, we hold that "communications equipment buildings" does not include cellular telephone towers.

The meaning of "utility lines," however, is not so clear. As U.S. Cellular and the County point out, insofar as HRS § 205–4.5(a)(7) mentions "utility lines" but not "utility poles," the rote application of "expressio unius est exclusio alterius" proposed by the neighbors would result in the absurdity of the lines themselves being permitted, but not any supporting poles or towers.[14] Further-

---

14. *But see generally* Public Utilities Commission, General Order No. 6 Rule 21.7 (rev.1969) [hereinafter PUC G.O. No. 6] (rules for overhead electric line construction) (defining "lines" as "those conductors together with their supporting poles or structures and appurtenances which are located outside of buildings.").

more, insofar as utilities are exempt from height regulations in county zoning codes, *see Citizens Util. Co. v. County of Kauai,* 72 Haw. 285, 814 P.2d 398 (1991), and HRS § 205–4.5(a)(7) simply refers to "utility lines" without reference to height, only the absence of actual "lines" would theoretically distinguish the instant tower from a "utility pole" of like stature. "Given the technological advances in the communications industry," U.S. Cellular asserts, "[there is] no reason to conclude that a telephone tower was not a permitted use simply because those advances obviated the need for wires to be attached."

Ultimately, we must look to the "reason and spirit" of state land use law to determine whether a cellular phone tower falls within what the legislature contemplated as "utility lines." *See* HRS § 1–15(2) (1993). The stated purpose of the law is, *inter alia:*

> to *protect and conserve* through zoning the urban, agricultural and conservation lands within all the counties. A coordinated, balanced approach not only within each county but an overall balance of statewide land needs for economic growth is essential to:
>
> (1) *Utilize the land resources in an intelligent, effective manner* based upon the capabilities and characteristics of the soil and the needs of the economy;
>
> (2) *Conserve* forests, water resources and land, particularly to *preserve* the prime agricultural lands from unnecessary urbanization;
>
> (3) *State the allocation of land for development in an orderly plan* to meet actual needs and minimize costs of providing utilities and other public services[15]. . . .

Hse. Stand. Comm. Rep. No. 395, in 1961 House Journal, at 855–56 (emphasis added). In sum, the overarching purpose of the state land use law is to "protect and conserve" natural resources and foster "intelligent," "effective," and "orderly" land allocation and development. *See* 1961 Haw. Sess. L. Act 187, § 1 at 299 ("[I]n order to preserve, protect and encourage the development of the lands in the State for those uses to which they are best suited for the public welfare . . ., the power to zone should be exercised by the State."). *See also Pearl Ridge Estates Community Ass'n v. Lear Siegler, Inc.,* 65 Haw. 133, 144 n. 9, 648 P.2d 702, 709 n. 9 (Nakamura, J., concurring) ("Thus, conservation lands must be reserved if practicable, agricultural lands should be protected, and urban lands should be developed in orderly fashion.").

In the instant case, we believe that the wholesale inclusion of cellular telephone towers in agricultural districts as "utility lines" under HRS § 205–4.5(a)(7) unreasonably expands the intended scope of this term and frustrates the state land use law's basic objectives of protection and rational development. Contrary to the suggestions of U.S. Cellular and the County, the instant cellular telephone tower is not a mere wireless "utility pole." A microwave antenna tower 140–feet in height represents a material departure from garden variety utility poles generally a fraction of the tower's size.[16] Indeed, undercutting U.S. Cellular and the County's argued analogy to "utility lines," the County's own zoning ordinance distinguishes "telecommunications antennas" and "power lines, utility substations, and public buildings" by way of definition, *see* HCC § 25–1–5,[17] as

---

15. We note that this reference to "minimi[zing] costs of providing utilities and other public services" arose in the context of uncontrolled residential development without regard to available utilities and infrastructure. *See* 1961 Haw. Sess. L. Act 187, § 1 at 299 ("Scattered subdivisions with expensive, yet reduced, public services . . . [is] evidence[] of the need for public concern and action."). This statement, therefore, expresses a subsidiary goal of minimizing utility costs *through* the primary objective of rational development, rather than at its expense.

16. *See generally* PUC G.O. No. 6 Rule 3.7, Table 1 (setting minimum vertical clearance of wires

"above ground along thoroughfares in rural districts or across other areas capable of being traversed by vehicles or agricultural equipment" at 15 to 30 feet, depending on the type of wire); *Id.* Rule 49.1(B) (designating minimum top circumference of wood poles at 12 to 22 inches, depending on load and district).

17. " 'Telecommunications antenna' means an antenna, tower and other accessory structure for radio frequency (RF) transmissions intended for specific users who must have special equipment for transmission and/or reception . . . ." *Id.*

well as scope of permitted use, *see* HCC § 25–4–12(a) (permitting "telecommunications antennas" as of right in all districts except residential districts); HCC § 25–4–11 (permitting power lines in any district). *See also* City and County of Honolulu Land Use Ordinance, art. 9 (1997) (distinguishing "transmitting antennas" from "utility installations"). Finally, we note the controversy in other jurisdictions surrounding the recent emergence of telecommunications antennas as indicative of how these types of structures, notwithstanding their "functional" similarity to normal "utility lines," tend to strain the limits of land use convention and practice. *See, e.g., Smart SMR v. Fair Lawn Bd. of Adjustment,* 152 N.J. 309, 704 A.2d 1271 (1998); *Crown Communications v. Zoning Hearing Bd. of Borough of Glenfield,* 550 Pa. 266, 705 A.2d 427 (1997); *Evans v. Shore Communications, Inc.,* 112 Md.App. 284, 685 A.2d 454 (1996); *Westel–Milwaukee Co. v. Walworth County,* 205 Wis.2d 244, 556 N.W.2d 107 (1996); *Cellular Telephone Co. v. Village of Tarrytown,* 209 A.D.2d 57, 624 N.Y.S.2d 170 (N.Y.App.Div.1995).

Based on the foregoing, we consider telecommunications towers or antennas a novel and unique use that, like the "wind energy facilities" noted by the circuit court, must find specific reference in HRS § 205–4.5(a) to be permitted as of right in state agricultural districts. Absent express indication in HRS § 205–4.5(a), U.S. Cellular must apply for a special permit. As we explained in *Neighborhood Board No. 24 (Waianae Coast) v. State Land Use Comm'n,* 64 Haw. 265, 639 P.2d 1097 (1982), special permit procedures

> evolved as a land use control device from a recognition of hardship frequently visited upon landowners due to the inherent rigidity of the Euclidean zoning system.... *Its essential purpose ... is to provide landowners relief in exceptional situations where the use desired would not change*

*the essential character of the district nor be inconsistent therewith.*

*Id.* at 265, 270–71, 639 P.2d 1097, 1101–02 (1982) (citations omitted) (emphasis and ellipses added). The special permit performs an integral function in the state's zoning scheme, allowing for "unusual" uses where "reasonable" and consistent with the law's underlying purposes. Here, the special permit provides the most appropriate mechanism for addressing the exceptional nature and impact of U.S. Cellular's cellular telephone tower.[18]

We therefore hold that the terms "communications equipment building" and "utility lines," as employed in HRS § 205–4.5(7), do not encompass "telecommunications antennas" or "transmission antennas" such as the instant cellular telephone tower. U.S. Cellular must therefore apply for a special permit under HRS § 205–6 to place the tower in a state agricultural district.

C. *The Valuation Of The Tower Development Under The CZMA Does Not Include The Cost Of The Site Lease, But, In Any Event, Insofar As The Board Erred In Determining That The Valuation Of The Tower Development Did Not Exceed $125,000, U.S. Cellular Must Obtain An SMA Use Permit.*

1. The Valuation Of The Tower Development Does Not Include The Cost Of Leasing The Tower Site.

 U.S. Cellular and the County also contend that the circuit court erred by ruling that the valuation of the development for purposes of the SMA permitting process under the CZMA must include the cost of the site lease. They argue that the plain definition of "valuation" in HRS § 205A–22 does not include costs associated with land acquisition. The neighbors, however, view land acquisition as part of the larger tower project and thus argue for the inclusion of such costs in the project's valuation.

---

**18.** We note that, except for the *Tarrytown* case, all the decisions from other jurisdictions cited *supra,* as well as the cases cited by the County in its brief, *see Cellular Telephone Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993); *Payne v. Taylor,* 178 A.D.2d 979, 578 N.Y.S.2d 327 (N.Y.App.Div.1991), involved the approval or denial of cellular telephone towers pursuant to variance or conditional use permit procedures. In *Tarrytown,* the community in fact attempted to impose a complete moratorium on such towers.

"Valuation," according to HRS § 205A–22, "shall be determined by the authority and means the estimated *cost to replace the structure in kind* based on current replacement costs, *or* in the cases of other development as defined above, the *fair market value of the development*." (Emphases added.) This provision, through the use of the disjunctive "or," establishes two separate methods of valuation according to the types of development present.[19] For development involving the building of "structures," the authority determines valuation based on the current replacement cost of the structures. For the valuation of other kinds of "development," however, the authority looks to the fair market value of the development. In the instant case, the development is limited to construction of the tower, foundation, and equipment building; "valuation" thus consists of the replacement cost of these structures.[20]

The neighbors argue that the lease of the land parcel constitutes a form of "development," the value of which should factor into the valuation of the total project. Noting that the definition of "development" in HRS § 205A–22 includes the "change in the density or intensity of use of land, including but not limited to the division or subdivision of land," the neighbors reason that, insofar as the lease in the present case operated as a "de facto subdivision,"[21] it constituted a "development" under HRS § 205A–22. Consequently, the neighbors argue, the valuation of the tower development should include the value of the lease as "subdivision costs."

We disagree with the neighbors' reasoning. Even assuming that the land lease in this case effected a "subdivision" of land, it does not follow that the value of such "development" includes the fair market value of the lease. In arguing for the inclusion of the value of the lease as "subdivision costs," the neighbors confuse land *subdivision* with land *acquisition.* The definition of "development" in HRS § 205A–22 indeed expressly excludes the mere acquisition of land, stating that "[d]evelopment does not include ... (9) Transfer of title to land; [and] 10) Creation or termination of easements, covenants, or other rights in structures or land." Whether or not a subdivision of land actually occurred in this case, therefore, the valuation of this "subdivision" does not include the value of the land lease.[22]

The definition of "development" in HRS § 205A–22, however, provides that:

whenever the authority finds that any excluded use, activity, or operation is or may become part of a larger project the cumulative impact of which may have significant environmental or ecological effect on a special management area, that use, activity, or operation shall be defined as "development" for the purpose of this part.

Based on this caveat, the neighbors argue that, insofar as the land lease formed part of a larger project with significant cumulative impacts, it constituted a "development" under HRS chapter 205A. *See generally Hawai'i's Thousand Friends v. City and County of Honolulu,* 75 Haw. 237, 858 P.2d 726 (1993). The CZMA, however, conditions the grant of an SMA minor permit on the author-

---

19. See *supra* note 8 for the definition of "development."

20. The County urges this court to adopt an "either-or" interpretation of "valuation" as follows: "First, if a structure is present, then the authority ... shall determine the estimated cost to replace the structure.... [I]f no structure is present, then the fair market value of other development will be considered. *But only if no structures are present.*" (Some emphasis deleted and some added.) The County, however, ignores that many development projects include both structural and non-structural components; the County's valuation method would exclude the cost of all non-structural development if the project featured *any* structure, however insignificant in relation to the project as a whole. We reject this

interpretation as absurd and unreasonable. Instead, we interpret HRS § 205A–22 as prescribing separate methods for the valuation of structural and non-structural development, but not precluding the use of both methods if the project includes both structural and non-structural elements.

21. Insofar as utilities are exempt from county subdivision regulations, *see* Hawai'i County Code § 23–11, U.S. Cellular did not have to formally "subdivide" the land in obtaining the tower site.

22. Furthermore, because U.S. Cellular was exempt from formal subdivision requirements, *see supra* note 21, it appears that the cost of "subdividing" the tower site was effectively zero.

ity finding that the proposed development "has no substantial adverse environmental or ecological effect, taking into account potential cumulative effects." HRS § 205A–22. *See also* HCPCRPP Rule 9–10(E), *supra* note 10. Accordingly, the board found and concluded in its decision that the tower had no such substantial adverse environmental or ecological effect. The neighbors do not challenge this ruling in the present appeal. We thus hold that the land lease in this case did not constitute a "development" under HRS chapter 205A.

Based on the foregoing, we hold that the circuit court erred in ruling that the valuation of the tower development must include the value of the land lease. Instead, valuation in this case consists of the "current replacement cost" of the structures built.

2. The Board Erred In Determining That The Replacement Cost Of The Tower Development Did Not Exceed $125,000.

▮▮▮▮▮ Even apart from the cost of the lease in the valuation of the tower development, however, the neighbors argue that the board erred in finding that the valuation did not exceed $125,000. As discussed above, HRS § 205A–22 defines "valuation" for structures as "the estimated cost to replace the structure in kind based on current replacement costs." "Replacement cost," a standard method of valuation often used in tax and eminent domain proceedings, *see, e.g., In the Matter of the Tax Appeal of Frank W. Swann,* 7 Haw.App. 390, 776 P.2d 395 (1989), refers to the current cost of creating a substantially equivalent structure. *See State Highway Comm'n v. Demarest,* 263 Or. 590, 503 P.2d 682, 690–91 (1971); American Institute of Real Estate Appraisers, The Appraisal of Real Estate 214–35 (7th ed.1978).

The actual cost of building the structure is indicative of replacement cost, though not necessarily dispositive. *See In re Swann,* 7 Haw.App. at 396, 776 P.2d at 399 ("The actual cost figures may reflect a peculiar advantage or disadvantage derived from the time or circumstances of the construction." (Citation and internal quotation marks omitted.)).

On three separate occasions, U.S. Cellular submitted a different estimate of the replacement cost of the tower development. In its application for an SMA minor permit, U.S. Cellular originally represented the cost of the tower development to be $63,000. In its building permit applications, however, U.S. Cellular represented the cost of the tower structure alone—not including the communications equipment building [23]—to be $170,700: $71,500 for the tower and $99,200 for the foundation. At the board hearing, U.S. Cellular's representative offered yet another estimate, claiming that the "tower ... there right now is not a normal vendor we would use" and that U.S. Cellular, "for whatever reason, I don't know," decided on the present foundation instead of other much cheaper alternatives.

U.S. Cellular conceded that the $170,700 figure reflected in the building permit applications indicated the actual cost of the tower foundation structure, but attributed the higher figures to cost overruns in building the foundation and use of a second-hand tower. Building permit applications, however, are generally submitted before construction commences and cost overruns occur; here, U.S. Cellular submitted the building permit application for the tower on January 14, 1993 and began construction in February 1993.[24] Furthermore, U.S. Cellular's claim that it obtained the tower in a used condition fails to explain why U.S. Cellular stated the value of

**23.** The estimates submitted by U.S. Cellular to the board held out the cost of the building as $15,000, the cost of the building foundation as $6,900 to 8,200, and the cost of erection as $1,200—a total of $ 23,100 to 24,400.

**24.** According to Michael Bennet, A U.S. Cellular employee, the high actual cost resulted from a "over-designed" foundation based on a soil engineering report erroneously predicting the existence of voids. When U.S. Cellular actually built

the foundation, however, it found no major voids, but instead discovered a "very large piece of very high quality rock, that [U.S. Cellular was] able to use as part of the structure." Anderson, however, attributed the dramatic increase in the amount of cement needed in the foundation to voids. In the final analysis, U.S. Cellular somehow needed less concrete, but inexplicably poured even more.

the tower, including installation costs, on its building permit application as $71,500.

The county deputy planning director originally estimated the cost of the tower development at $85,000 to $90,000, increasing his estimate only by $10,000 after he learned of the building permit figures. The County's own tax appraisers, however, had assessed the cost of the tower at $170,700, and U.S. Cellular had apparently raised no objection. The board, without discussion, adopted the planning director's finding that the valuation of the tower development was less than $125,000.

We are mindful of the presumptive validity of agency findings. Nevertheless, we will not hesitate to overturn a finding of fact as clearly erroneous when, "despite evidence to support the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *Britt v. U.S. Auto. Ass'n,* 86 Hawai'i 511, 516, 950 P.2d 695, 700 (1998) (citing *Hirono v. Peabody,* 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996)). Having reviewed the entire record in this case, we remain convinced, in light of the substantial degree to which actual cost exceeded $125,000, the remarkable disparity between representations of actual and replacement cost, and the absence of an adequate explanation for these discrepancies, that the agency erred in valuing the tower development below $125,000. We therefore hold that the board's finding that the valuation of the tower development did not exceed $125,000 was clearly erroneous. The SMA minor permit issued by the County is thus invalid, and U.S. Cellular must obtain an SMA use permit for its cellular telephone tower.

## IV. CONCLUSION

For the forgoing reasons, we affirm the portion of the circuit court's order reversing the board's conclusion that HRS § 205–4.5(a) permits cellular telephone towers as of right in state agricultural districts; thus, U.S. Cellular must obtain a special permit under HRS § 205–6. We reverse the portion of the circuit court's order concluding that land acquisition costs must be included in the valuation of the tower development under HRS

§ 205A–22. However, insofar as we hold that the board's finding that the valuation of the tower development was clearly erroneous, we reverse the County's issuance of an SMA minor permit to U.S. Cellular without prejudice to an application by U.S. Cellular for an SMA use permit.