104 P.3d 930

**T–MOBILE USA, INC., formerly Voicestream PCS II Corporation,[1] Appellant,**

v.

**COUNTY OF HAWAI'I PLANNING COMMISSION, Appellee.**

No. 24381.

Supreme Court of Hawai'i.

Jan. 11, 2005.

---

1. Appellant's name changed pursuant to the notice re: name change filed on October 8, 2004.

Roy A. Vitousek III and Kristin S. Shigemura (of Cades Schutte Fleming & Wright), Honolulu, on the briefs, for appellant.

Ivan M. Torigoe, Deputy Corporation Counsel, on the briefs, for appellee.

MOON, C.J., LEVINSON, and DUFFY, JJ.; NAKAYAMA, J., dissenting, with whom ACOBA, J., joins.

### Opinion of the Court by MOON, C.J.

Appellant Voicestream PCS II Corporation (Voicestream) appeals from the third circuit court's June 18, 2001 judgment[2] that affirmed the decision of appellee County of Hawai'i Planning Commission (HCPC), requiring Voicestream to obtain a special permit in connection with its development of a wireless communication network on the island of Hawai'i. Briefly stated, Voicestream's proposed construction in this case involves the installation of a "stealth" or cellular antenna concealed in a "false" chimney attached to a single family farm dwelling, including accompanying communications equipment placed in an adjacent garage. The single family farm dwelling is situated in a state land use agricultural district and is, therefore, subject to the uses prescribed in Hawai'i Revised Statutes (HRS) chapter 205.

On appeal, Voicestream contends that the circuit court erred in affirming the HCPC's decision that Voicestream is required to obtain a special permit. For the reasons discussed herein, we reverse the circuit court's June 18, 2001 judgment affirming the decision of the HCPC.

---

2. Judgment was entered by the Honorable Riki May Amano.

## I. BACKGROUND

### A. Factual Background

Voicestream is a wireless communications provider licensed by the Federal Communications Commission and registered with the Hawai'i Public Utilities Commission. Voicestream is currently developing a wireless communication network in the County of Hawai'i using stealth antennas.

The instant case concerns the proposed installation of a stealth antenna at the residence of Timothy and LeNora Wee in the Pu'u Nani Agricultural Subdivision in Kamuela, Hawai'i. Voicestream planned to attach to the Wee residence a false chimney housing a 23.5–foot tall pole, measuring 2 and 7/8 inches in diameter, with three flat-panel directional antennas mounted flush with the top of the pole. Voicestream's plan also includes the construction of a separate garage to house equipment for the antenna.

### B. Procedural Background

Prior to August 31, 2000, Voicestream informally requested that the County of Hawai'i Planning Director (planning director) determine whether a special permit was required for the proposed stealth antenna.[3] After consulting with the Department of the Corporation Counsel, the planning director informed Voicestream that a special permit was required for all telecommunications antennas pursuant to this court's decision in *Curtis v. Bd. of Appeals, County of Hawai'i*, 90 Hawai'i 384, 394–97, 978 P.2d 822, 832–35 (1999), wherein this court held that a special permit was required to build a 140–foot cellu-

lar telephone tower on state agricultural land.

On August 31, 2000, Voicestream filed its application for a special permit for the proposed stealth antenna. A hearing on the special permit application was held on October 20, 2000, during which Voicestream requested that the HCPC make a preliminary decision pursuant to HRS § 91–8 (1993)[4] as to whether a special permit was required before rendering a decision on the special permit application. The HCPC unanimously decided that the stealth antenna required a special permit and granted the issuance thereof. On November 24, 2000, the HCPC entered its written decision.

On December 15, 2000, Voicestream appealed to the circuit court, seeking review of the HCPC's decision that a special permit was required for its stealth antenna.[5] Voicestream contended that this court's decision in *Curtis* did not require it to obtain a special permit pursuant to HRS §§ 205–4.5 (Supp. 1997), quoted *infra*, and 205–6(a) (Supp. 1998)[6] to construct and maintain the proposed stealth antenna in the state land use agricultural district. After a hearing on the matter, the circuit court affirmed the decision of the HCPC on June 18, 2001 and entered the following findings of fact (FOF) and conclusions of law (COL):

### FINDINGS OF FACT

1. The HCPC has agreed that the statement of facts in VoiceStream's Opening Brief filed on January 31, 2001, pp. 2–5, is accurate and therefore the [c]ourt

---

3. We note that Voicestream refers to the false chimney, garage and antenna collectively as the "stealth antenna" in their application for a special permit and on appeal. Likewise, the HCPC and circuit court decisions discussed herein reference them as the "stealth antenna."

4. HRS § 91–8 provides:

Any interested person may petition an agency for a declaratory order as to the applicability of any statutory provision or of any rule or order of the agency. Each agency shall adopt rules prescribing the form of the petitions and the procedure for their submission, consideration, and prompt disposition. Orders disposing of petitions in such cases shall have the same status as other agency orders.

5. Voicestream did not appeal the HCPC's approval of its special permit application.

6. HRS 205–6(a) states:

The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. Each county may establish the appropriate fee for processing the special permit petition.

accepts these facts as proven and incorporates them herein by reference.

2. The wireless communications antennae [sic] proposed by VoiceStream would be enclosed in a false chimney constructed by VoiceStream and which would be incorporated into the Wee residence. The communication equipment associated with the antennae would be locked in a cabinet that would be at the rear of a new garage that VoiceStream would construct.

3. *The height of the antennae [sic], 23.5 feet, would be within the height limitations for farm dwellings in the State land use and County zoning districts.*

4. *Both the garage and the chimney are permitted uses as accessory to a farm dwelling pursuant to HRS Ch. 205 and Hawaii County Code Ch. 25.*

5. The HCPC's interpretation of *Curtis* as stated in its Decision and in the statements of [the planning director] is that a Special Permit is required to construct or maintain any cellular communication "tower" or "antenna."

6. The court accepts as fact that VoiceStream intends to continue building "stealth" or concealed cellular communications antennae in Hawaii County state land use Agricultural District.

7. The court accepts as fact that the HCPC's position will continue to be that an HRS § 205–6 Special Permit is required for each and every case in which VoiceStream intends to construct any cellular communications antenna in a Hawaii County state land use Agricultural District.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this appeal pursuant to HRS §§ 603–21.8, and 91–7.

2. The ongoing adverse interest to VoiceStream is the HCPC's interpretation of *Curtis:* that the construction of a wireless communications antenna, even under the circumstances presented here where the antenna will be completely enclosed within an otherwise legally permitted structure, requires a Special Permit issued pursuant to HRS § 205–6.

3. This court can fashion an effective remedy by deciding whether or not an HRS § 205–6 Special Permit is in fact required in this case.

4. Accordingly, the Appeal is not moot and this court has jurisdiction to decide the merits of the Appeal because there is an adverse impact and the court can provide an effective remedy to VoiceStream.

5. However, this court finds that in *Curtis* the Hawaii Supreme Court interpreted the exceptions listed in HRS § 205–4.5 to exclude the construction of cellular communication towers by its holding: "[w]e therefore hold that the terms 'communications equipment building' and 'utility lines' as employed in HRS § 205–4.5(7) cannot encompass 'telecommunications antennas' or 'transmission antennas' such as the instant cellular phone tower."

6. The court finds that based on the *Curtis* analysis, *VoiceStream's cellular communication antenna enclosed within a chimney does not fall within the definition of a "communications equipment building" as provided in HRS § 205–4.5(a)(7).*

7. The court also finds that *the cellular communication antenna enclosed within a chimney is not a building or use that is normally considered accessory to a permitted farm dwelling, employee housing, or farm building as provided in HRS § 205–4.5(a)(4) and –4.5(a)(10).*

(Emphases added.) (Citations omitted.) On July 5, 2001, pursuant to HRS § 602–5(1) (1993) and Hawai'i Rules of Appellate Procedure Rule 3 (2000) and Rule 4 (2001), Voicestream filed its timely notice of appeal to this court.

### II. STANDARDS OF REVIEW

A. *Review of an Agency Decision*

 Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision.

HRS § 91–14 [ (1993) ], entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2) and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

*Paul's Electrical Service, Inc. v. Befitel*, 104 Hawai'i 412, 416, 91 P.3d 494, 498 (2004) (citations and quotation marks omitted). "Pursuant to HRS § 91–14(g), an agency's conclusions of law are reviewed de novo." *Id.* at 420, 91 P.3d at 502 (citing *Camara v. Agsalud*, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

B. *Statutory Interpretation*

▮▮▮ "The interpretation of a statute ... is a question of law reviewable de novo."

Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider "the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another."

*Barnett v. State*, 91 Hawai'i 20, 31, 979 P.2d 1046, 1057 (1999) (ellipses points in original) (citations and brackets omitted).

## III. *DISCUSSION*

As indicated above, the circuit court concluded that:

the cellular communication antenna enclosed within a chimney *is not a building or use that is normally considered accessory to a permitted farm dwelling, employee housing, or farm building* as provided in HRS § 205–4.5(a)(4) and – 4.5(a)(10).

COL No. 7 (emphasis added). HRS § 205–4.5(a) states in relevant part:

**Permissible uses within the agricultural districts.**

(a) Within the agricultural district all lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A

or B[7] shall be restricted to the following permitted uses:

...;

(4) Farm dwellings, employee housing, farm buildings, or activity or uses *related to farming and animal husbandry;*

Farm dwelling as used in this paragraph means a single-family dwelling located on and used in connection with a farm, including clusters of single-family farm dwellings permitted within agricultural parks developed by the State, or where agricultural activity provides income to the family occupying the dwelling;

...;

(10) *Buildings and uses,* including but not limited to mills, storage, and processing facilities, maintenance facilities, and vehicle and equipment storage areas *that are normally considered directly accessory to the abovementioned uses* [ (*i.e.,* in this case, farming and animal husbandry) ] and are permitted under section 205–2(d)[ (Supp.1995).[8]]

(Emphases added.)

The circuit court also concluded that:

based on the *Curtis* analysis, VoiceStream's cellular communication antenna

enclosed within a chimney *does not fall within the definition of a "communications equipment building" as provided in HRS § 205–4.5(a)(7).*

COL No. 6 (emphasis added). Permitted uses under HRS § 205–4.5(a)(7) include:

Public, private, and quasi-public utility lines and roadways, transformer stations, *communications equipment buildings,* solid waste transfer stations, major water storage tanks, and appurtenant small buildings such as booster pumping stations, but not including offices or yards for equipment, material, vehicle storage, repair or maintenance, or treatment plants, or corporation yards, or other like structures[.]

(Emphasis added.)

In *Curtis,* the USCOC of Hawai'i 3, Inc. (U.S. Cellular), a certified public utility, constructed a 140–foot cellular telephone tower, which sits on a concrete foundation, in South Kona, as well as a small prefabricated building containing communications equipment situated next to the tower. 90 Hawai'i at 387, 978 P.2d at 825. "Photographs reveal that the tower stands well over twice the height of any of the surrounding vegetation and structures." *Id.* The tower and prefabricated building were constructed pursuant to a special management area minor permit is-

7. "Pursuant to section 15–15–25(b) of the [S]tate Land Use Commission rules (rev.1997), HRS § 205–4.5(a) ... applies to agricultural lands with soil classifications of C, D, E, and U." *Curtis,* 90 Hawai'i at 388, 978 P.2d at 826. Therefore, although the land in this case is classified as "D," HRS § 205–4.5 applies.

8. HRS § 205–2(d) provides:

(d) Agricultural districts shall include activities or uses as characterized by the cultivation of crops, orchards, forage, and forestry; farming activities or uses related to animal husbandry, aquaculture, and game and fish propagation; aquaculture, which means the production of aquatic plant and animal life for food and fiber within ponds and other bodies of water; wind generated energy production for public, private, and commercial use; bona fide agricultural services and uses which support the agricultural activities of the fee or leasehold owner of the property and accessory to any of the above activities, whether or not conducted on the same premises as the agricultural activities to which

they are accessory, including but not limited to farm dwellings as defined in section 205–4.5(a)(4), employee housing, farm buildings, mills, storage facilities, processing facilities, vehicle and equipment storage areas, and roadside stands for the sale of products grown on the premises; wind machines and wind farms; small-scale meteorological, air quality, noise, and other scientific and environmental data collection and monitoring facilities occupying less than one-half acre of land, provided that such facilities shall not be used as or equipped for use as living quarters or dwellings; agricultural parks; and open area recreational facilities, including golf courses and golf driving ranges; provided that they are not located within agricultural district lands with soil classified by the land study bureau's detailed land classification as overall (master) productivity rating class A or B.

These districts may include areas which are not used for, or which are not suited to, agricultural and ancillary activities by reason of topography, soils, and other related characteristics.

sued by the Hawai'i County planning department. *Id.*

Surrounding neighbors of the communications tower challenged the planning director's approval of the construction, which was rejected by the Hawai'i County Board of Appeals. *Id.* The circuit court, on appeal, reversed the board's decision, ruling, *inter alia*, that the tower was not a permitted use in an agricultural district. On appeal to this court, U.S. Cellular and the County of Hawai'i argued that "the tower in question is a permitted use 'as of right' in an agricultural district as a 'utility line' or 'communications equipment building' under section 205–4.5(a)(7)." *Id.* at 394–95, 978 P.2d at 832–33. Relying on the plain language of the statute to conclude that the tower was not a "communications equipment building," this court stated:

> Preliminarily, we agree that the plain meaning of "communications equipment buildings" excludes cellular telephone towers. Black's Law Dictionary (6th ed.1990) defines "building" as a "[s]tructure designed for habitation, shelter, storage.... A structure or edifice enclosing a space within its walls[.]" The term *"communications equipment building," therefore, denotes a structure—not unlike the small prefabricated building accompanying the tower in the instant case—containing or housing communications equipment, rather than standing as a gigantic piece of such equipment in itself.* At the outset, therefore, we hold that "communications equipment buildings" does not include cellular telephone towers.

*Id.* at 395, 978 P.2d at 833 (emphasis added) (citation omitted) (ellipses points and brackets in original).

With respect to whether the tower fell within the term "utility lines" as employed in HRS § 205–4.5(a)(7), this court observed that "[t]he meaning of 'utility lines,' however, is not so clear." *Id.* This court, therefore, turned to the "reason and spirit" of the state land use law to determine whether the tower fell within what the legislature contemplated

as "utility lines." *Id.* at 396, 978 P.2d at 834. We recognized that the stated purpose of land use law is, *inter alia*,

> to protect and conserve through zoning the urban, agricultural and conservation lands within all the counties.

> A coordinated, balanced approach not only within each county but an overall balance of statewide land needs for economic growth is essential to:

> (1) Utilize the land resources in an intelligent, effective manner based upon the capabilities and characteristics of the soil and the needs of the economy;

> (2) Conserve forests, water resources and land, particularly to preserve the prime agricultural lands from unnecessary urbanization;

> (3) State the allocation of land for development in an orderly plan to meet actual needs and minimize costs of providing utilities and other public services....

*Id.* (citing Hse. Stand. Comm. Rep. No. 395, in 1961 House Journal, at 855–56) (emphases and footnote omitted). Based on the "reason and spirit" of land use law, we held that "the wholesale inclusion of cellular telephone towers in agricultural districts as 'utility lines' under HRS § 205–4.5(a)(7) unreasonably expands the intended scope of this term and frustrates the state land use law's basic objectives of protection and rational development." *Id.* at 396, 978 P.2d at 834.

In reaching the foregoing conclusion, we distinguished the tower from recognized public utilities in Hawai'i County. *Id.* at 395–96, 978 P.2d at 833–34. Specifically, we referenced Public Utilities Commission, General Order No. 6 Rule 21.7 (rev.1969), which set forth the spatial limitations for overhead electric lines. *Id.* at 395 n. 14, 978 P.2d at 833 n. 14. Because the minimum vertical clearance of electrical wires, a recognized utility, was fifteen to thirty feet, we held that the tower in *Curtis* was disproportionately larger and represented "a material departure from garden variety utility poles generally a fraction of the tower's size." [9] *Id.* at 396, 978 P.2d at 834 (footnote omitted).

---

9. As an aside, we also noted that "[Hawai'i] County's own zoning ordinance distinguishes

'telecommunications antennas' and 'power lines, utility substations, and public buildings' by way

Moreover, we noted the controversy in other jurisdictions surrounding the recent emergence of telecommunications antennas to demonstrate that, notwithstanding their "functional" similarity to "utility lines," telecommunications antenna towers are distinguishable therefrom because their size tends to strain the limits of land use convention and practice. *Id.* at 397, 978 P.2d at 835 (citing *Evans v. Shore Communications, Inc.,* 112 Md.App. 284, 685 A.2d 454, 462 (Md.1996) (addressing zoning board's conclusion that variance to increase 200–foot tower to 300–feet would result in loss of scenic views); *Smart SMR v. Borough of Fair Lawn Bd. of Adjustment,* 152 N.J. 309, 704 A.2d 1271, 1274, 1277 (1998) (illustrating zoning board's decision that 140–foot "monopole" would be aesthetically displeasing); *Crown Communications v. Zoning Hearing Bd. of Borough of Glenfield,* 550 Pa. 266, 705 A.2d 427, 430 (1997) (describing zoning board's decision that 375–foot communications tower would be a nuisance); *Westel–Milwaukee Co. v. Walworth County,* 205 Wis.2d 244, 556 N.W.2d 107, 108 (Wis.Ct.App.1996) (entertaining claims that 200–foot telecommunications tower would depreciate the value of surrounding property and negatively impact the aesthetics of scenic farmland)).

Based on the foregoing analysis, we held that

the terms "communications equipment building" and "utility lines," as employed in HRS § 205–4.5[ (a) ](7) do not encompass "telecommunications antennas" or "transmission antennas" such as the instant cellular telephone tower. U.S. Cellular must therefore apply for a special permit under HRS § 205–6 to place the tower in a state agricultural district.

*Curtis,* 90 Hawai'i at 397, 978 P.2d at 835.

In the instant appeal, Voicestream contends that the circuit court erred by concluding that, based on *Curtis:* (1) the antenna is

not a building or use that is normally considered accessory to a permitted farm dwelling, employee housing, or farm building, pursuant to HRS §§ 205–4.5(a)(4) and –4.5(a)(10); (2) Voicestream's cellular antenna, concealed within a false chimney, does not fall within the definition of a "communications equipment building" as provided in HRS § 205–4.5(a)(7); and (3) a special permit was required for Voicestream to construct its cellular antenna inside a false chimney that, standing alone, would be a permitted use in the state land use agricultural district and under county zoning.[10] In essence, Voicestream seeks a determination whether its proposed construction is a "permitted use" in the state land use agricultural district under HRS § 205–4.5(a). In making that determination, we examine, as did the HCPC and the circuit court, whether Voicestream's proposed construction is permitted: (1) as a building or use directly accessory to a farm dwelling under HRS §§ 205–4.5(a)(4) and –4.5(a)(10); and/or (2) as a "communications equipment building" under HRS § 205–4.5(a)(7).

A. *Whether Voicestream's Proposed Construction is Permitted as a Building or Use Directly Accessory to a Farm Dwelling under HRS §§ 205–4.5(a)(4) and –4.5(a)(10)*

As previously indicated, Voicestream's proposed construction involves the placement of a chimney on the Wee residence to house the cellular antenna, as well as building a separate garage to house equipment for the antenna. The circuit court's unchallenged FOF Nos. 3 and 4 establish, respectively, that (1) the height of the antenna (23.5 feet) is within the height limitations for farm dwellings in the state land use and county zoning districts and (2) the chimney and garage, by themselves, are permitted as

of definition[.]" *Curtis,* 90 Hawai'i at 396, 978 P.2d at 834 (citing HCC § 25–1–5 (1999)).

10. Alternatively, Voicestream argues that, if this court decides that the circuit court did not err in affirming the decision of the HCPC, this court should revisit and clarify its interpretation of HRS § 205–4.5 in *Curtis*

to distinguish between: (a) an immense cellular communication tower that is not expressly permitted under HRS § 205–4.5(a); and (b) a shorter antenna that is concealed within a structure that meets applicable land use and zoning requirements and which is consistent with the public policy, and "reason and spirit" of the land use law[.]

accessory to a farm dwelling. Concealing the cellular antenna within the permitted chimney and housing equipment for the antenna in the permitted garage, however, require further examination.

Pursuant to HRS §§ 205–4.5(a)(4) and –4.5(a)(10), buildings and uses or activities related to farming and animal husbandry, including those considered directly accessory to such uses, are permissible. Clearly, a wireless communications antenna and its attendant equipment are not uses related to farming and animal husbandry.

We, therefore, hold that, under HRS §§ 205–4.5(a)(4) and –4.5(a)(10), the chimney and garage themselves are permitted as accessory to a farm dwelling; however, utilizing the chimney to conceal the antenna and the garage to house the communication equipment are not permitted uses under either subsection (a)(4) or (a)(10) of the statute.

B. *Whether Voicestream's Proposed Construction is Permitted as a "Communications Equipment Building" under HRS § 205–4.5(a)(7)*

 As previously indicated, Voicestream argues that the circuit court erred in concluding that its cellular antenna, concealed within a false chimney, does not fall within the definition of a "communications equipment building" as provided in HRS § 205–4.5(a)(7).

In *Curtis,* this court relied on the plain language of HRS § 205–4.5(a)(7) to hold that the cellular telephone tower at issue therein did not constitute a "communications equipment building" inasmuch as it was not a " 'structure designed for habitation, shelter, [or] storage ... [and was not a] structure or edifice enclosing a space within its walls.' " *Curtis,* 90 Hawai'i at 395, 978 P.2d at 833 (brackets in original omitted). However, in our view, the chimney in the instant case qualifies as a "building" as defined in *Curtis* because it is a "structure designed for ... storage" (*i.e.,* the antenna) and is also a "structure or edifice enclosing a space within its walls." *Id.* Additionally, the Wee residence is a "building" as defined in *Curtis*

because it is a "structure designed for habitation, shelter ... [and is a] structure or edifice enclosing a space within its walls." *Id.* (brackets omitted).

It is undisputed that the cellular antenna in this case, like the cellular telephone tower in *Curtis,* including its accompanying equipment, are communications equipment. Thus, we hold that, under the circumstances of this case, the Wee residence and the chimney with the concealed antenna constitute a "communications equipment building" and, thus, are permitted uses under HRS § 205–4.5(a)(7).

With respect to Voicestream's plan to build a garage to house equipment for the antenna, such a garage would be similar to the prefabricated building that this court approved of in *Curtis. See Curtis,* 90 Hawai'i at 395, 978 P.2d at 833 (holding that "[t]he term 'communications equipment building,' therefore, denotes a structure—not unlike the small prefabricated building accompanying the tower in the instant case—containing or housing communications equipment"). As in *Curtis,* the garage in the instant case is not abnormally large and was designed specifically to store the communications equipment for Voicestream's concealed antenna. Thus, consistent with our decision in *Curtis,* we hold that utilizing the permitted garage structure to house the communications equipment for the antenna is a permitted use under HRS § 205–4.5(a)(7).

The dissent asserts that our analysis would enable wireless service providers to circumvent the permitting process by simply enclosing large antennas within four walls. According to the dissent, since a "communications equipment building" is not limited by any height restrictions under HRS § 205–4.5(a)(7), wireless service providers could construct large antennas without obtaining a special permit by (1) enclosing them so as to be permissible under HRS § 205–4.5(a)(7) as "communications equipment buildings" and then (2) labeling the antennas and their enclosures "telecommunications antennas"[11] under HCC § 25–1–5(B)(101), which are allowed as of right, HCC § 25–5–71(a)(21), up

11. The term "telecommunications antenna" is defined, *infra.*

to a height of five hundred feet, HCC § 25–4–22(c), on agricultural land. *See* dissent at 354–56, 104 P.3d at 941–942. We disagree.

As previously discussed, an enclosed antenna constitutes a "communications equipment building" under HRS § 205–4.5(a)(7). Under county zoning ordinances, however, an enclosed antenna is a building, not a "telecommunications antenna." HCC § 25–1–5(b)(15) defines "building" as "any structure used or intended for support or sheltering any use or occupancy." Inasmuch as the enclosure for the antenna is intended to support wireless transmissions and/or shelter communications equipment, it is a "building."

HCC § 25–1–5(b)(101) defines a "telecommunications antenna" as an "antenna, tower and *other accessory structures* for radio frequency (RF) transmissions intended for specific users who must have special equipment for transmission and/or reception." (Emphasis added.) In order for the enclosed antenna and its surrounding structure (i.e., building) to fall within the definition of a "telecommunications antenna," the building must be an "accessory structure."

The term "accessory structure" is not defined by the HCC. However, we recognize that, in statutory construction, "laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." *Barnett*, 91 Hawai'i at 31, 979 P.2d at 1057. HCC § 25–1–5(b)(99) provides that the term "structure" includes the term "building." Thus, inasmuch as the term "structure" encompasses a "building," it logically follows that an "accessory structure" encompasses an "accessory building." HCC

§ 25–1–5(b)(1) defines an "accessory building" as a "building, no more than twenty feet in height, *detached from and subordinate to a main building or main use* on the same building site and used for the purposes customarily incidental to those of the main building or use." (Emphasis added.) Clearly, a building enclosing an antenna is not detached from a main building or use since it, in effect, *is* the main building. Consequently, a building enclosing an antenna cannot be an "accessory building" under HCC § 25–1–5(b)(1). Thus, an enclosed antenna does not fall within the definition of a "telecommunications antenna" under HCC § 25–1–5(b)(101).

We reiterate, however, that an enclosed antenna is still a building and, therefore, subject to the height limitations prescribed in HCC §§ 25–5–73 [12] and 25–4–22 [13] (1999).

The dissent also contends that the structures in the instant case are not "communications equipment buildings" because they are inconsistent with the legislative history regarding HRS § 205–4.5(a)(7). *See* dissent at 356–58, 104 P.3d at 942–944. It is well-settled in this jurisdiction that courts turn to legislative history as an interpretive tool only where a statute is unclear or ambiguous. *State v. Mueller*, 102 Hawai'i 391, 394, 76 P.3d 943, 946 (2003). In *Mueller*, this court held:

A cardinal canon of statutory construction is that this court cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts. This is because we do not legislate or make laws. It is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole

---

12. HCC § 25–5–73 provides:

1. The height limit in the [agricultural] district shall be thirty-five feet for any residential structure, including any single-family dwelling, or farm dwelling, and forty-five feet for all other structures. The director may, however, permit by plan approval, any nonresidential agricultural structures to be constructed to a height of one hundred feet, if the director determines that the additional height above the forty-five foot height limit is necessary.

13. HCC § 25–4–22 (1999), entitled "Exemptions from height limitations," provides in pertinent part:

1. The following structures are exempt from zoning district height limits under the specified restrictions:

(a) Chimneys, spires, belfries, water tanks, monuments, steeples, antennae, flag poles, vent pipes, fans, structures housing or screening elevator machinery and other similar features, not to exceed ten feet above the governing height limit.

duty is to give effect to the statute's plain and obvious meaning.

*Id.* (citations, quotation marks and brackets omitted) (emphasis added). Given the foregoing, we note that in *Curtis,* this court held that a 140–foot tower was not a permitted use in an agricultural district based on the plain meaning of "communications equipment building." 90 Hawai'i at 395, 978 P.2d at 833. Thus, inasmuch as this court has previously recognized the term "communications equipment building" as utilized in HRS § 205–4.5(a)(7) to be plain and unambiguous, we are not at liberty to look beyond the statute's plain and obvious meaning.

Nevertheless, even if this court were to examine legislative history as an interpretive tool, the structures in the instant case—to wit, the Wee residence with the false chimney housing Voicestream's antenna and the garage housing the accompanying equipment—are consistent with the legislature's intent.

The House standing committee report addressing the addition of "communications equipment building" to HRS § 205–4.5(a)(7) stated:

The purpose of this bill is to include communications equipment buildings as a permitted use in agricultural land along with other similar utilities now permitted.

This bill will permit Hawaiian Telephone to construct such facilities as other public service companies and agencies are now permitted without the need to apply for variances. It will also enable the customers to receive telephone service much faster than the present time-consuming method.

Hse. Stand. Comm. Rep. No. 690, in 1977 House Journal, at 1605. Further, the Senate standing committee report commented that the addition of "communications equipment buildings" to HRS § 205–4.5(a)(7)

would improve service to telephone customers and reduce the cost of providing service. Other utilities are [now] permitted in agricultural land, such as utility lines, electric transformer stations and water booster pumping stations; this bill will include communications equipment build-

ings as well and will *better serve farmers and others residing in agricultural lands.*

Sen. Stand. Comm. Rep. No. 840, in 1977 Senate Journal, at 1219 (emphasis added). The dissent argues that Voicestream's construction was not intended by the legislature to be included in the term "communications equipment building" because "the additional 'communications equipment' then needed to complete the agricultural district's wire-based networks [are] certainly not comparable in function, much less scale, to the transmitting towers and antennas now required to send wireless telephone signals into far flung agricultural areas." *See* dissent at 357, 104 P.3d at 943. With respect to function, we fail to see any function specific to the communications equipment required for land lines that would distinguish such equipment from that needed to support wireless transmissions. Both appear to serve the same purpose, mainly, to facilitate telephone communications.

Moreover, the dissent makes no argument that the function of Voicestream's wireless communications equipment is inconsistent with the legislature's intent to "better serve farmers and others residing in agricultural lands." Voicestream's structures are intended to facilitate a transmission link from Waimea to the highway leading to Honoka'a inasmuch as current service in the Waimea/Kamuela area covers only the immediate town. Thus, by allowing Voicestream to erect its structures, Voicestream would be able to provide wireless coverage for farmers and others residing in agricultural lands who are currently without access. We believe this service is consistent with the legislature's intent.

With respect to scale, the dissent's bald assertion that the equipment necessary for wireless telephone signals is larger in scale than that required for land lines in 1977— when the term "communications equipment building" was added to HRS § 205–4.5(a)(7)—lacks merit. There is no evidence in the record—and the dissent points to nothing in the record or elsewhere—to support its assertion. What the record reflects is the fact that the communications equipment for Voicestream's wireless signal would be

housed in a false chimney and within a locker in the back of a permitted garage structure. We believe the scale for the communications equipment, under the instant facts, is not substantial. Accordingly, inasmuch as the equipment for land lines and wireless signals are "comparable" in function and scale, our holdings that Voicestream's structures are "communications equipment buildings" are consistent with the legislature's intent.

Moreover, we believe that our holdings today are consonant with legislative intent in that they also comport with the "reason and spirit" of state land use law. Unlike the 140–foot tower in *Curtis*, or the other massive antenna towers referenced in the cases cited therein, the antenna in this case is entirely concealed within a chimney that, standing alone, is permitted under HRS §§ 205–4.5(a)(4) and –4.5(a)(10) and is clearly not "standing as a gigantic piece of ... equipment in itself." *Curtis*, 90 Hawai'i at 395, 978 P.2d at 833. Additionally, contrary to the dissent's view, there is nothing in the record to indicate that the presence of the concealed antenna in this case would undermine the state land use law's objectives of protecting and conserving natural resources and fostering intelligent, effective, and orderly land allocation and development, or expand the intended scope of the term "communications equipment building." *Curtis*, 90 Hawai'i at 396, 978 P.2d at 834.

### III. *CONCLUSION*

Based on the foregoing, we hold that: (1) under HRS §§ 205–4.5(a)(4) and –4.5(a)(10), the chimney and garage themselves are permitted as accessory to a farm dwelling; however, utilizing the chimney to conceal the antenna and the garage to house the communication equipment are not permitted uses under either subsection (a)(4) or (a)(10) of the statute; (2) under the circumstances of this case, the Wee residence and the chimney with the concealed antenna constitute a "communications equipment building" and, thus, are permitted uses under HRS § 205–4.5(a)(7); and (3) utilizing the permitted ga-

rage structure to house the communication equipment for the antenna is a permitted use under HRS § 205–4.5(a)(7). Consequently, Voicestream is not required to obtain a special permit for the proposed installation that is the subject of this appeal (*i.e.*, construction of a false chimney to conceal its 23.5–foot cellular antenna and a garage to house its communications equipment). Accordingly, we reverse the circuit court's June 18, 2001 judgment affirming the decision of the HCPC.

Dissenting Opinion by NAKAYAMA, J., in which ACOBA, J., joins.

I respectfully dissent from the majority's holding that the cellular antenna in this case constitutes a "communications equipment building" under Hawai'i Revised Statutes (HRS) § 205–4.5(a)(7).

The majority bases its decision on *Curtis v. Board of Appeals, County of Hawai'i*, in which we held that a 140–foot cellular telephone tower was not a "communications equipment building" under HRS § 205–4.5(a)(7), and that a special permit was therefore required to construct the tower in the state agricultural district. 90 Hawai'i 384, 394–395, 978 P.2d 822, 832–33 (1999) (opinion by Nakayama, J.). Our conclusion stemmed from our commonsense understanding of the term "building," which in our opinion appropriately denoted the small prefabricated structure adjacent to the cellular tower, but plainly did not describe the tower itself. *Id.* at 395, 978 P.2d at 833. I have always read *Curtis* to mean what it says—namely, that cellular antennas and towers proposed in the state agricultural district require special permits prior to construction because they present a "novel and unique use" that lacks "specific reference" in HRS § 205–4.5(a). *Id.* at 397, 978 P.2d at 835.

Today's decision interprets *Curtis* to endorse the far different proposition that a cellular antenna or tower may be shielded from special permit review simply by having its structure enclosed.[1] In arriving at this

---

1. Indeed, if our chief quarrel in *Curtis* had merely been that U.S. Cellular's tower was "exposed," we might cordially have suggested that the com-

pany sheath the offending edifice within some other structure to spare the expense of obtaining a special permit. That suggestion we obviously

conclusion, the majority reasons that (1) a fake chimney is a "building" because it is a "structure designed for storage" and an "edifice enclosing a space within its walls," (2) a cellular antenna constitutes "communications equipment," and (3) the housing of "communications equipment" within a "building" makes the structure a "communications equipment building" under HRS § 205–4.5(a)(7).

As the telecommunications industry will no doubt concede, all "communications equipment" may be completely "stored" within another "structure or edifice enclosing a space within its walls" given the requisite economic incentive.[2] The majority's analysis accordingly permits a properly concealed cellular tower or antenna of *any* size to be built as of right in the state agricultural district-the only caveat being that the structure complies with the less restrictive land use controls found in the counties' respective zoning ordinances.

The majority fails to appreciate the untoward mischief that will result from tasking those ordinances with primary responsibility for regulating all such "buildings" sited on agricultural lands. By way of example, the Hawai'i County Code (HCC) permits "telecommunications antennas"[3] to be constructed as of right within the county's agricultural district,[4] and further allows their maximum height to reach "five hundred feet from existing grade."[5] Such towers and antennas need only receive approval from the director of the county planning department,[6] who acts under significant time constraints[7] and without the benefit of public notice or hearing.[8] An enclosed cellular tower or antenna[9] may therefore ascend far above the county agricultural district's 35–foot height limit for residential buildings,[10] and may be constructed with much greater rapidity and markedly less oversight than would be the case had HRS § 205–4.5(a)(7) been interpreted less expansively.[11]

declined to make—in my view, for the reasons set forth below.

**2.** The emergence of "stealth" antennas camouflaged as 80–foot "pine trees," 130–foot "lighthouses," and 50–foot "cacti" attests to the ingenuity with which transmitting equipment may now be concealed. *See* Julie Rawe, *Cellular's New Camouflage,* Time, Dec. 3, 2002, *available at* http://www.time.com/time/insidebiz/printout/0,8816, 1101021209–395336,00.html; James Gonser, *Fake Tree May Hide New Cellular Tower,* Honolulu Advertiser, Dec. 10, 2002, *available at* http://the.honoluluadve rtiser.com/article/2002/Dec/10/ln/ln12a.html; Michelle Delio, *Stealth Antennas Try to Blend In,* Wired News, Jan. 14, 2003, *available at* http://www.wired.com/news/wireless/0,1382,57199,00.html?tw=wn_story_related.

**3.** The HCC defines a "telecommunications antenna" as "an antenna, tower and other accessory structures for radio frequency (RF) transmissions intended for specific users who must have special equipment for transmission and/or reception...." HCC § 25–1–5(b)(101).

**4.** *See* HCC § 25–5–72(a)(21).

**5.** *See* HCC § 25–4–22(c).

**6.** *See* HCC § 25–2–75(c), § 25–2–76, § 25–4–12(a).

**7.** *See* HCC § 25–2–75(e) ("The director shall render a decision to either approve or deny a plan

approval application within thirty days after acceptance of the application.").

**8.** *See* HCC § 25–2–71(c)(3), § 25–2–72, § 25–2–74.

**9.** Contrary to the majority's assertion, I believe that a cellular tower or antenna that is wholly enclosed continues to fall within the definition of a "telecommunications antenna" set forth in HCC § 25–1–5(b)(101). *See Kau v. City & County of Honolulu,* 104 Hawai'i 468, 474, 92 P.3d 477, 483 (2004) ("[W]hen interpreting a municipal ordinance, we apply the same rules of construction that we apply to statutes. The interpretation of a statute is a question of law reviewable *de novo*.").

**10.** *See* HCC § 25–5–73.

**11.** The majority responds that "an enclosed antenna does not fall within the definition of a 'telecommunications antenna'" because the "building" that encloses the antenna "is the main building" and not an "accessory structure." Majority at 352, 104 P.3d at 939. If this is so, I question how an enclosed antenna that is not a "telecommunications antenna" can be built in the county agricultural district without a special permit. As with other zoning ordinances, the HCC enumerates certain "permitted uses" that may be undertaken as of right in the agricultural district, *see* HCC § 25–5–72(a), and also allows—again as of right—"[b]uildings and uses accessory to [those] uses." HCC § 25–5–72(e).

The majority's position is moreover in error, in my view, because an enclosed cellular tower or antenna constitutes no more a "permitted use" under HRS § 205–4.5(a) than one that is exposed. That much is apparent from the history [12] of HRS § 205–4.5(a)(7),

which added the term "communications equipment building" during the 1977 legislative session [13] to facilitate cost-effective *land-line* telephone service in agricultural areas.[14] As telephone companies were already free to string "utility lines" upon agricultural lands,[15] the additional "communications

---

Uses or structures that are not either "permitted" or "accessory" under the HCC must generally obtain a special permit pursuant to HRS chapter 205 if, as is the case here, the proposed structure is located in the state agricultural district. HCC § 25–5–72(c) & (d).

HCC § 25–5–72(a)(21) designates "telecommunications antennas" as a "permitted use," and allows them to be built as of right in the county agricultural district. In light of the majority's claim that an enclosed cellular antenna is not a "telecommunications antenna," I for one am unable to discern any alternative "permitted use" in HCC § 25–5–72(a) which would allow such antennas to be constructed as of right and without a special permit.

As a further unintended consequence, the majority's holding renders inapplicable a number of county restrictions specific to "telecommunications antennas." HCC § 25–4–12(a), for instance, prohibits a "telecommunications antenna" from being constructed unless it is "not hazardous or dangerous to the surrounding area and the director has issued plan approval for such use." An application for "plan approval" must contain assurances from a licensed structural engineer and various *federal agencies* that the proposed antenna is structurally sound and complies with applicable federal regulations. HCC § 25–2–74. The director may only approve the application after considering certain "[r]eview criteria and conditions," HCC § 25–2–76, among them whether the structure adheres to "minimum setback" requirements and has a "hard survivability [in] sustained winds of at least one hundred miles per hour." HCC § 25–4–12(b) & (c).

As the foregoing restrictions apply only to "telecommunications antennas," they are inapplicable to enclosed cellular antennas if, as the majority contends, such antennas are not "telecommunications antennas."

12. While I agree that we generally "turn to legislative history as an interpretive tool only where a statute is unclear or ambiguous," the exclusion of probative extrinsic indicia of legislative intent is by no means absolute. In this connection, we have previously stated:

Although the intention of ˙the legislature is to be obtained primarily from the language of the statute itself, we have rejected an approach to statutory construction which limits us to the words of a statute, for when aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination. *Thus, the plain language rule of statutory*

construction does not preclude an examination of sources other than the language of the statute itself even when the language appears clear upon perfunctory review. Were this not the case, a court may be unable to adequately discern the underlying policy which the legislature seeks to promulgate and, thus, would be unable to determine if a literal construction would produce an absurd or unjust result, inconsistent with the policies of the statute. *Young v. Planning Comm'n of County of Kaua'i,* 89 Hawai'i 400, 408, 974 P.2d 40, 48 (1999) (opinion by Moon, C.J.) (emphasis added) (quoting *Sato v. Tawata,* 79 Hawai'i 14, 17, 897 P.2d 941, 944 (1995)).

13. *See* 1977 Haw. Sess. L. Act 136, § 1, at 243.

14. Indicative of that purpose, the House standing committee's report on the amendment stated:

The purpose of this bill is to include communications equipment buildings as a permitted use in agricultural land along with other similar utilities now permitted.

This bill will permit Hawaiian Telephone to construct such facilities as other public service companies and agencies are now permitted without the need to apply for variances. It will also enable the customers to receive telephone service much faster than the present time-consuming method.

Hse. Stand. Comm. Rep. No. 690, in *1977 House Journal,* at 1605. The Senate standing committee report moreover noted that the proposed inclusion of "communications equipment buildings"

would improve service to telephone customers and reduce the cost of providing service. Other utilities are [now] permitted in agricultural land, such as utility lines, electric transformer stations and water booster pumping stations; this bill will include communications equipment buildings as well and will better serve farmers and others residing on agricultural lands.

Sen. Stand. Comm. Rep. No. 840, in 1977 Senate Journal, at 1219; *see also* Sen. Stand. Comm. Rep. No. 899, in 1977 Senate Journal, at 1230 (same).

15. As originally enacted in 1976, HRS § 205–4.5(a)(7) restricted prime agricultural lands to the following permitted uses:

Public, private, and quasi-public utility lines, and roadways, transformer stations, solid waste transfer stations, and appurtenant small buildings such as booster pumping stations,

equipment" then needed to complete the agricultural district's wire-based networks was certainly not comparable in function to the transmitting towers and antennas now required to send wireless telephone signals into far flung agricultural areas.[16] The absence of a single reported decision dealing with "communications equipment buildings" prior to *Curtis* moreover indicates to me that such structures were, as a historical matter, sufficiently unobtrusive as to engender no significant litigation within agricultural communities.

By departing from the legislature's original understanding of the operative statutory language, the majority unnecessarily frustrates the State's comprehensive policy of protecting agricultural lands from non-agricultural development.[17] In the wake of our

decision, cellular service providers will surely see the virtue in constructing "buildings" to "store" and "enclose" all manner of towers and antennas—especially since, as Appellant claims here, the ineluctable prospect of public scrutiny, delay, and expense awaits all who elect to expose their towers to the special permit process. The laudable goal of fostering intelligent, effective, and orderly development will unquestionably suffer. *See Curtis*, 90 Hawai'i at 396, 978 P.2d at 834.

---

but not including offices or yards for equipment, material, vehicle storage, repair or maintenance, treatment plants and major storage tanks not ancillary to agricultural practices, or corporation yards or other like structures[.]

1976 Haw. Sess. L. Act 199, § 1, at 370.

16. Unlike the majority, I perceive a functional distinction between equipment that assists in transmitting telephonic signals along telephone wires and equipment that emits such signals through the air.

17. Whether the benefits of cellular coverage in the agricultural district outweigh its costs, such that cellular towers and antennas should be permitted as of right on agricultural lands, is a question of policy appropriately within the legislative ken. The legislature's regular amendments to HRS § 205-4.5(a) attest to that body's willingness to reassess permissible uses within the agricultural district in the face of changing conditions and needs. *See* 1977 Haw. Sess. L. Act 136, § 1, at 243 ("communications equipment buildings"); 1980 Haw. Sess. L. Act 24, § 3, at 36 ("wind energy facilities"); 1982 Haw. Sess. L. Act 217, § 1, at 402 ("major water storage tanks"); 1991 Haw. Sess. L. Act 281, § 3, at 675 ("vehicle and equipment storage areas").